UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>BORIS AMINOV,<br>CHRISTY CORVALAN,<br>IRINA POLVANOVA,<br>ROMAN SHAMALOV,<br>ANTONIO PAYANO,<br>DAVID FERNANDEZ,<br>CRYSTAL MEDINA,<br>JUAN HERNANDEZ,<br>    a/k/a "Pop," and<br>ALBERT YAGUDAYEV,<br>    a/k/a "Jeff,"<br><br>                    Defendants. | **SEALED SUPERSEDING INDICTMENT**<br><br>S1 23 Cr. 110 (MKV) |

Overview

1.      From at least in or about 2017 through at least in or about 2023, BORIS AMINOV, CHRISTY CORVALAN, IRINA POLVANOVA, ROMAN SHAMALOV, ANTONIO PAYANO, DAVID FERNANDEZ, and CRYSTAL MEDINA, the defendants, engaged in a scheme that defrauded Medicaid, Medicare, and private insurance companies out of at least approximately $20 million through trafficking in black-market HIV medication.  In doing so, they exploited at least hundreds of low-income individuals who had been prescribed HIV medication, jeopardizing the health and safety of those vulnerable patients.

2.      BORIS AMINOV and ANTONIO PAYANO, the defendants, distributed black-market HIV medications to pharmacies that were owned and operated by, among others, CHRISTY CORVALAN, the defendant (the "Corvalan Pharmacies"), IRINA POLVANOVA, the defendant (the "Polvanova Pharmacy"), and ROMAN SHAMALOV, the defendant (the

"Shamalov Pharmacy").

3.    After purchasing black-market medication from BORIS AMINOV and ANTONIO PAYANO, the defendants, CHRISTY CORVALAN, IRINA POLVANOVA, and ROMAN SHAMALOV, the defendants, then dispensed that medication to patients of the Corvalan and Polvanova Pharmacies, or otherwise distributed it to other pharmacies. DAVID FERNANDEZ and CRYSTAL MEDINA, the defendants, were employees of the Corvalan Pharmacies who participated in the day-to-day operation of the scheme.

4.    As part of the scheme, CHRISTY CORVALAN, IRINA POLVANOVA, DAVID FERNANDEZ, CRYSTAL MEDINA, JUAN HERNANDEZ, a/k/a "Pop," and ALBERT YAGUDAYEV, a/k/a "Jeff," the defendants, also funded and paid illegal kickbacks to patients in order to recruit patients to their respective pharmacies. CORVALAN, POLVANOVA, FERNANDEZ, MEDINA, HERNANDEZ, and YAGUDAYEV regularly attempted to recruit new patients to increase the number of prescription medications for which the Pharmacies could fraudulently bill government insurance. CORVALAN, FERNANDEZ, and MEDINA also paid patients to sell back their HIV medications to the Corvalan Pharmacies, thereby inducing patients to forego using the medications they were prescribed.

5.    From at least in or about 2021 through at least in or about October 2023, ROMAN SHAMALOV and IRINA POLVANOVA, the defendants, engaged in a related scheme where they bought and then re-sold diverted black-market prescription HIV medication through online prescription drug marketplaces to other pharmacies around the country that believed they were receiving legitimately sourced medication.

6.    In order to further their schemes and conceal their proceeds, CHRISTY CORVALAN, IRINA POLVANOVA, and ROMAN SHAMALOV, the defendants, used bank

2

accounts associated with their respective pharmacies to funnel money to shell companies controlled by BORIS AMINOV, the defendant.

<u>The Regulation and Distribution of Prescription HIV Medication</u>

7.      Prescription medications are of critical importance to treating many types of diseases, including HIV, and therefore, the movement, storage, and sale of these medications is carefully regulated.   To ensure their safety, prescription drugs are typically sent from the manufacturer to one of only a handful of authorized wholesale distributors, who, in turn, either sell the prescription medications directly to pharmacies, or sell those medications to other licensed wholesale distributors who, in turn, sell the medications to pharmacies for ultimate distribution to patients.

8.      Prescription drug manufacturers additionally set standards for the safe handling of prescription medications.   For example, many HIV medications must be stored at precise temperatures.   These standards must be upheld by all distributors who handle, buy, and sell prescription medication along the traditional drug supply chain.   Failure to comply with these standards can impact the efficacy of the drugs and the safety of the patients receiving them. Maintaining the integrity of the prescription drug supply chain is therefore critical to ensuring that all prescription drugs remain safe for human consumption by the time they are ultimately distributed to patients.

9.      The United States Food and Drug Administration ("FDA") is charged with protecting the health and safety of the American public, including by regulating the manufacture, distribution, and dispensation of prescription drugs.   The FDA regulates the manufacture, distribution, and dispensation of prescription drugs through a number of laws, including the Food, Drug, and Cosmetic Act ("FDCA"), the Drug Supply Chain Security Act ("DSCSA"), and the

Prescription Drug Marketing Act ("PDMA").

10.     These laws impose several requirements on those who manufacture, distribute, and dispense prescription drugs.  For example:

a.   Only a properly licensed business may engage in the wholesale distribution of prescription medications.  "Wholesale distribution" is distribution of prescription drugs to a person other than a consumer or patient.

b.   Only properly licensed pharmacies may dispense prescription drugs to a patient.

c.   All prescription drug wholesale distributors must create a record of any drug product transaction in order to maintain the integrity and security of the drug supply chain. Specifically, wholesale drug distributors must maintain and provide to purchasers—whether other distributors or medication dispensers, such as pharmacies—documentation detailing the provenance of the drugs they sell, including a transaction history, transaction statements, and transaction information.  Such documentation must state, among other things, where or from whom the distributor purchased the drugs.

d.   Both prescription drug wholesale distributors and dispensers, such as pharmacies, must only purchase prescription medication from manufacturers and distributors that are properly licensed under all applicable federal and state laws.  In addition, drug dispensers, such as pharmacies, may not purchase prescription medication from a wholesale distributor when that distributor has failed to provide valid transaction history, transaction information, and a transaction statement associated with the medication being sold.

e.   Both prescription drug wholesale distributors and dispensers, such as pharmacies, must carefully inspect and quarantine any prescription drug that comes into their

possession that they have reason to believe is suspect, illegitimate, or otherwise unsafe for consumption by patients.

11. In addition to regulation of the prescription drug supply chain, the price paid for prescription drugs is also carefully controlled. Drug manufacturers generally set a Wholesale Acquisition Cost ("WAC") for the prescription medication they sell, that is, a price they charge wholesale distributors before the application of any rebates, discounts, allowances, and other price concessions. There is little deviation from the WAC for name brand, non-generic drugs that remain under patent. For this reason, drug distributors or dispensers who purchase prescription medication from the legitimate, regulated drug supply chain are generally unable to purchase that medication for substantially lower than the WAC.

12. Prescription drug distributors and dispensers are generally only able to purchase drugs at prices significantly below the WAC when they obtain those drugs through means outside the legitimate, regulated drug supply chain. The term prescription drug "diversion" describes prescription drugs that are removed—or "diverted"—from the chain of lawful manufacturers, distributors, and dispensers. Prescription drug diversion typically occurs through several different unlawful means, including theft, fraud, or purchases—also known as "buy-backs"—from individual patients who never consumed the drugs they were prescribed. Diverted prescription drugs are often obtained and unlawfully resold by unlicensed distributors to other unlicensed distributors, or directly to pharmacies, who ultimately dispense the diverted medication to patients.

13. By purchasing diverted medication, wholesale distributors and dispensers, such as pharmacies, are often able to obtain prescription drugs for substantially less than the WAC. However, when pharmacies submit a claim to Medicare or Medicaid, they receive the same amount of money in reimbursement—generally a payment at or near the stated WAC for a particular

prescription drug—regardless of what they ultimately paid for the prescription drug. Purchasing diverted medication at lower cost outside the regulated supply chain therefore enables the pharmacy to earn a larger profit on each prescription medication it dispenses.

14.    Prescription drug diversion, while profitable for unscrupulous wholesale distributors and pharmacies, disrupts the integrity of the regulated prescription drug supply chain. When prescription drug diversion occurs, the FDA is unable to properly monitor the manufacture, distribution, and dispensation of prescription drugs. Many diverted medications therefore lack indicia of authenticity or proper quality control. This lack of regulation puts patient health and safety at risk. For this reason, among others, both wholesale drug distributors and dispensers, such as pharmacies, are required under the FDCA and DSCSA to take steps to remove diverted medication from the regulated drug supply chain.

The Diversion Scheme

15.    When enrolling in Medicare and Medicaid programs, pharmacies must attest that they will only submit insurance reimbursement claims for medication that was obtained and dispensed in full compliance with all applicable state and federal laws, including the FDCA and the DSCSA. However, the medication for which the Corvalan and Polvanova Pharmacies often billed government insurance was obtained outside the regulated supply chain and dispensed in violation of those applicable laws.

16.    BORIS AMINOV and ANTONIO PAYANO, the defendants, supplied diverted black-market medication to, among others, the Corvalan Pharmacies, the Shamalov Pharmacy, and the Polvanova Pharmacy. AMINOV and PAYANO supplied these pharmacies with diverted black-market medication at prices substantially below the WAC so that the pharmacies could profit from the reimbursement payments they received from Medicare, Medicaid, other insurance, or

selling to other pharmacies. Specifically:

a. CHRISTY CORVALAN, DAVID FERNANDEZ, and CRYSTAL MEDINA, the defendants, used the Corvalan Pharmacies to consistently bill their patients' government insurance for the full value of the HIV medication dispensed to patients, and in turn, collected the full amount of money paid by government insurance for that medication. But rather than purchase medication from authorized and legitimate distributors of HIV medication, CORVALAN, FERNANDEZ, and MEDINA instead purchased diverted HIV medication from black-market sources, including BORIS AMINOV and ANTONIO PAYANO, the defendants, and distributed that potentially unsafe medication to their patients. The fraudulent scheme generated huge profits for AMINOV and PAYANO, the black-market wholesalers, and CORVALAN, FERNANDEZ, and MEDINA, the retailers of the black-market medications. Specifically, they profited as much as approximately $3,000 for each monthly prescription that they filled.

17. CHRISTY CORVALAN, the defendant, knew that the quality and condition of the diverted HIV medication received from black-market sources was potentially dangerous, and she took steps to make the bottles of diverted medication falsely appear that they were new and in proper condition. For example, on or about October 20, 2020, CORVALAN sent a WhatsApp message, which had an accompanying photograph of a bottle of the HIV medication Tivicay, to BORIS AMINOV, the defendant, in which CORVALAN explained to AMINOV that he had already sold her too many degraded and inauthentic bottles of medication that required alteration in order to appear legitimate, and she was unwilling to take this additional specific bottle because of its especially-poor quality and condition: "I was going to keep it but I really can't . . . I already have enough bad ones to work with." As a further example, on or about June 7, 2021, CORVALAN sent a text message to ANTONIO PAYANO, the defendant, in which she explained

7

that she needed to receive bottles that appeared to be in good condition and quality: "I just cleaned like 6 and they [] come good to u so if you can't bring them clean I can't take it good expiration and bar code good."

18.     IRINA POLVANOVA, the defendant, engaged in a similar scheme at the Polvanova pharmacy.  Specifically, the Polvanova Pharmacy consistently billed its patients' government insurance for the full value of the HIV medication it dispensed to them.  However, rather than obtain all prescription medication from legitimate sources, POLVANOVA instead purchased diverted black-market HIV medication from BORIS AMINOV, the defendant, at a fraction of the WAC.

19.     ROMAN SHAMALOV, the defendant, purchased hundreds of thousands of dollars in diverted black-market HIV medication from BORIS AMINOV, the defendant.

20.     ANTONIO PAYANO, the defendant, purchased medication directly from patients and altered bottles for resale.  On or about June 9, 2021, PAYANO stated the following in a text message to an individual from whom he was seeking to buy back medication: "70 per bottle they have to be sealed . . . and don't rip nothin off the bottle . . . I'll take ur name of[f] them."  PAYANO knew he was buying back medication from patients who were potentially risking their lives by selling the HIV medication they had been prescribed.  In a text message discussion on or about June 3, 2020, a patient asked the price that PAYANO was willing to pay for a bottle of Biktarvy, and told PAYANO: "350 when the pills actually cost 2,000 idk bro why am I risking my life for such little $ I feel like there's people that will actually pay more I just gotta find them lol."  Moreover, PAYANO knew that insurance was likely to reimburse far more money for the medication than PAYANO ultimately bought or sold it for.  On or about May 3, 2021, another patient wrote to PAYANO: "U still want the biktarvy I told u I dnt let it go for no more than 400

8

no less I dnt bargain the pills cost 3000 the insurance ppl told me so 400 is good enough."

21.     This diversion scheme had two sets of victims: government insurance programs and the patients of the Pharmacies.

a.  First, Medicaid and other government insurance programs were defrauded out of at least approximately $17 million in payments that they made to the Corvalan and Polvanova Pharmacies.  Medicaid and other government insurance programs paid the Corvalan and Polvanova Pharmacies based on false representations by the Pharmacies that the medication for which they were seeking reimbursement was procured and distributed in compliance with all applicable federal and state laws, including the FDCA and the DSCSA.

b.  Second, the scheme exploited low-income HIV patients of the Corvalan and Polvanova Pharmacies, and in the process, potentially put those vulnerable patients' health and safety at risk.  Modern HIV medication is very effective at controlling the symptoms of HIV.  But effective HIV treatment requires strict adherence to a prescribed medication regimen, with patients needing to take specific doses of specific medications at specific times.  By purchasing diverted HIV medication from black-market sources instead of through legitimate distributors, the pharmacies could not assure the quality or condition of the medication they provided to their patients, thereby creating a risk that patients would receive counterfeit, expired, or improperly dosed medication.

The Buyback and Kickback Schemes

22.     In addition to purchasing diverted HIV medication from illegitimate wholesalers such as BORIS AMINOV and ANTONIO PAYANO, the defendants, CHRISTY CORVALAN, DAVID FERNANDEZ, and CRYSTAL MEDINA, the defendants, also potentially jeopardized the health and safety of the Corvalan Pharmacies' patients by encouraging the patients to sell back

9

their medication to the Corvalan Pharmacies instead of taking those medications as prescribed. Specifically, CORVALAN, FERNANDEZ, and MEDINA encouraged patients to enroll in a "buy-back" program whereby a patient could receive a few hundred dollars in exchange for their monthly supply of HIV medication. Most patients of the Corvalan Pharmacies were low-income individuals enrolled in Medicaid. Those patients were presented with the decision of whether to take the medication they had been prescribed, or to skip a month of their prescribed medication in exchange for cash from CORVALAN, FERNANDEZ, and MEDINA. When CORVALAN, FERNANDEZ, and MEDINA acquired medication for the Corvalan Pharmacies through the "buy-back" program, they would then fill other patients' prescriptions using that diverted medication, instead of spending the money they had collected from government insurance to purchase legitimately-sourced medication for those patients.

23.    CHRISTY CORVALAN, DAVID FERNANDEZ, and CRYSTAL MEDINA, the defendants, spent the proceeds of the scheme to purchase luxury cars, including a 2021 Mercedes-Benz Maybach with an estimated fair market value of approximately $245,000, waterfront real-estate, including two properties in the Bronx purchased for a total of approximately $2.4 million, designer clothes, and jewelry. The picture below shows CORVALAN sitting on the hood of the Mercedes-Benz Maybach that she purchased with the proceeds of the scheme.



24.     To increase their profits even further, CHRISTY CORVALAN, DAVID FERNANDEZ, and CRYSTAL MEDINA, the defendants, made monthly kickback payments of as much as approximately hundreds of dollars to induce patients to fill their prescriptions at the Corvalan Pharmacies.

25.     Similarly, IRINA POLVANOVA, JUAN HERNANDEZ, a/k/a "Pop," and ALBERT YAGUDAYEV, a/k/a "Jeff," the defendants, recruited patients to the Polvanova Pharmacy and another pharmacy ("FamilyRX Pharmacy"), where YAGUDAYEV was employed as a manager. Specifically, POLVANOVA, HERNANDEZ, and YAGUDAYEV made monthly kickback payments of as much as approximately $150 per patient to encourage patients to fill their prescriptions for HIV medications at the Polvanova Pharmacy and FamilyRX Pharmacy. POLVANOVA orchestrated the kickback scheme for the Polvanova Pharmacy by organizing the delivery of HIV medication and kickbacks to patients of the Polvanova Pharmacy. YAGUDAYEV paid kickbacks directly to patients of FamilyRX Pharmacy. Throughout the scheme, POLVANOVA and YAGUDAYEV communicated regularly with HERNANDEZ, who

delivered medication and kickbacks to patients on behalf of both the Polvanova Pharmacy and FamilyRX Pharmacy. HERNANDEZ also recruited new patients to both the Polvanova Pharmacy and FamilyRX Pharmacy in order to further the illegal kickback scheme.

26.     As part of the kickback scheme, on several occasions throughout the duration of the scheme, both JUAN HERNANDEZ, a/k/a "Pop," and ALBERT YAGUDAYEV, a/k/a "Jeff," the defendants, supplied a confidential source ("CS-1") with a cash kickback payment along with CS-1's monthly refill of HIV medication in exchange for CS-1's use of FamilyRX Pharmacy.

The Online Marketplace Scheme

27.     In or about 2021, IRINA POLVANOVA and ROMAN SHAMALOV, the defendants, began to engage in a related scheme to defraud purchasers of HIV medication— typically retail pharmacies—by selling diverted black-market medication through online prescription drug marketplaces (the "Online Marketplaces"). In order to sell on the Online Marketplaces, sellers of prescription medications must attest that they agree to follow all federal and state regulations, including those set forth in the FDCA and the DSCSA. But rather than sell legitimately sourced prescription medications in accordance with those laws, SHAMALOV and POLVANOVA sold diverted medication that they had purchased through illegitimate channels, including from BORIS AMINOV, the defendant. Other pharmacies purchased that medication on the Online Marketplaces at or near the WAC. In this regard, the SHAMALOV and POLVANOVA defrauded the pharmacies that believed they were purchasing legitimately-sourced medication. SHAMALOV sold approximately $9 million of drugs on the Online Marketplaces, approximately $3 million of which were HIV medications. POLVANOVA sold approximately $500,000 of HIV medication on the Online Marketplaces.

The Money Laundering Scheme

28.     Over the duration of the diversion, buyback, and kickback schemes described above, CHRISTY CORVALAN, the defendant, used the Corvalan Pharmacies to pay more than $6 million to BORIS AMINOV, the defendant.  To conceal those payments, AMINOV instructed CORVALAN to have the Corvalan Pharmacies make the payments in handwritten checks made out to the names of shell companies controlled by AMINOV.  Those checks were then cashed at a single check-cashing store located in New Jersey.

29.     Over the duration of the diversion, kickback, and online marketplace schemes, IRINA POLVANOVA, the defendant, used the Polvanova Pharmacy to transfer almost $2 million in proceeds from the scheme to BORIS AMINOV, the defendant.  POLVANOVA made payments via handwritten check to the same shell companies controlled by AMINOV to which CHRISTY CORVALAN, the defendant, also made payments.  During the scheme, POLVANOVA and AMINOV communicated regularly about the flow of illegal proceeds from the Polvanova Pharmacy bank account to shell company bank accounts controlled by AMINOV.

30.     Over the duration of the diversion and online marketplace schemes, ROMAN SHAMALOV, the defendant, used the Shamalov Pharmacy to pay hundreds of thousands of dollars to BORIS AMINOV, the defendant.  To conceal the payments that SHAMALOV was making to AMINOV, AMINOV instructed SHAMALOV to make payments to some of the same shell companies to which AMINOV also instructed CHRISTY CORVALAN and IRINA POLVANOVA, the defendants, to make payments.

**COUNT ONE**
**(Conspiracy to Commit Wire Fraud and Health Care Fraud)**

The Grand Jury charges:

31.     The allegations contained in Paragraphs 1 through 30 above are hereby repeated,

realleged, and incorporated by reference as if fully set forth herein.

32. From at least in or about 2020 through at least in or about 2023, in the Southern District of New York and elsewhere, BORIS AMINOV, CHRISTY CORVALAN, IRINA POLVANOVA, ANTONIO PAYANO, DAVID FERNANDEZ, and CRYSTAL MEDINA, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343, and health care fraud, in violation of Title 18, United States Code, Section 1347.

33. It was a part and an object of the conspiracy that BORIS AMINOV, CHRISTY CORVALAN, IRINA POLVANOVA, ANTONIO PAYANO, DAVID FERNANDEZ, and CRYSTAL MEDINA, the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

34. It was further a part and an object of the conspiracy that BORIS AMINOV, CHRISTY CORVALAN, IRINA POLVANOVA, ANTONIO PAYANO, DAVID FERNANDEZ, and CRYSTAL MEDINA, the defendants, and others known and unknown, knowingly and willfully would and did execute, and attempt to execute, a scheme and artifice to defraud a health care benefit program, and to obtain, by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, a health care benefit program in connection with the delivery of and payment for health care

14

benefits, items, and services, in violation of Title 18, United States Code, Section 1347.

(Title 18, United States Code, Section 1349.)

## COUNT TWO
### (Conspiracy to Violate the Anti-Kickback Statute)

The Grand Jury further charges:

35. The allegations contained in Paragraphs 1 through 30 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

36. From at least in or about 2020 through at least in or about 2023, in the Southern District of New York and elsewhere, CHRISTY CORVALAN, IRINA POLVANOVA, DAVID FERNANDEZ, CRYSTAL MEDINA, JUAN HERNANDEZ, a/k/a "Pop," and ALBERT YAGUDAYEV, a/k/a "Jeff," the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, offering and paying a health care kickback, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B).

37. It was a part and object of the conspiracy that CHRISTY CORVALAN, IRINA POLVANOVA, DAVID FERNANDEZ, CRYSTAL MEDINA, JUAN HERNANDEZ, a/k/a "Pop," and ALBERT YAGUDAYEV, a/k/a "Jeff," the defendants, and others known and unknown, knowingly and willfully would and did offer and pay remuneration, including a kickback, bribe, and rebate, directly and indirectly, overtly and covertly, in cash and in kind, to a person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering a good, facility, service, and item for which payment may be made in whole and in part under a federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B).

15

## Overt Acts

38.     In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a.     On or about October 19, 2020, CRYSTAL MEDINA, the defendant, discussed with a patient kickback payments to be made to that patient and another potential patient.

b.     On or about December 3, 2021, DAVID FERNANDEZ, the defendant, made a kickback payment to a patient through CashApp.

c.     On or about May 31, 2022, CHRISTY CORVALAN, the defendant, made a kickback payment to a patient through CashApp.

d.     On or about October 14, 2022, IRINA POLVANOVA, the defendant, texted BORIS AMINOV, the defendant, to inform him of the number of HIV prescriptions the Polvanova Pharmacy had delivered that week to patients who were paid kickbacks and which delivery people, including JUAN HERNANDEZ, a/k/a "Pop," the defendant, were assigned to deliver each medication.

e.     On or about October 14, 2022, HERNANDEZ made a kickback payment to CS-1.

f.     On or about December 15, 2022, ALBERT YAGUDAYEV, a/k/a "Jeff," the defendant, made a kickback payment to CS-1.

(Title 18, United States Code, Section 371.)

## COUNT THREE
## (Conspiracy to Defraud the United States)

The Grand Jury further charges:

39.     The allegations contained in Paragraphs 1 through 30 above are hereby repeated,

16

realleged, and incorporated by reference as if fully set forth herein.

40. From at least in or about 2017 through at least in or about 2023, in the Southern District of New York and elsewhere, BORIS AMINOV, CHRISTY CORVALAN, ROMAN SHAMALOV, IRINA POLVANOVA, ANTONIO PAYANO, DAVID FERNANDEZ, and CRYSTAL MEDINA, the defendants, and others known and unknown, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to defraud the United States and its agencies by impeding, impairing, and defeating the lawful functions of the United States Food and Drug Administration to protect the health and safety of the public by ensuring that prescription drugs are safe and effective from the time of manufacturing to the time they are delivered to patients.

41. It was a part and object of the conspiracy that BORIS AMINOV, CHRISTY CORVALAN, ROMAN SHAMALOV, IRINA POLVANOVA, ANTONIO PAYANO, DAVID FERNANDEZ, and CRYSTAL MEDINA, the defendants, and others known and unknown, would and did intentionally and knowingly impede, impair, and defeat the lawful functions of the United States Food and Drug Administration by engaging in the unlawful distribution and dispensation of diverted, black-market HIV medication, obstructing the Food and Drug Administration's effort to ensure patient safety and secure the prescription drug supply chain against counterfeit, diverted, adulterated and misbranded prescription drugs.

## Overt Acts

42. In furtherance of the conspiracy and to effect the illegal object thereof, the following overt acts, among others, were committed in the Southern District of New York and elsewhere:

a. On or about May 10, 2021, BORIS AMINOV and CHRISTY

17

CORVALAN, the defendants, exchanged text messages regarding CORVALAN's purchase of diverted, black-market HIV medication from AMINOV.

b. On or about July 23, 2021, AMINOV and ROMAN SHAMALOV, the defendant, exchanged text messages regarding SHAMALOV's purchase of diverted, black-market HIV medication from AMINOV.

c. On or about June 7, 2021, CORVALAN and ANTONIO PAYANO, the defendant, exchanged text messages regarding the sale and purchase of diverted, black-market HIV medication.

d. On or about July 14, 2020, CORVALAN and DAVID FERNANDEZ, the defendant, exchanged text messages about paying a patient to buy back HIV medication that could be dispensed to another patient.

e. On or about October 19, 2020, CORVALAN and CRYSTAL MEDINA, the defendant, exchanged text messages about paying a patient to buy back HIV medication that could be dispensed to another patient.

(Title 18, United States Code, Section 371.)

## COUNT FOUR
### (Mail Fraud)

The Grand Jury further charges:

43. The allegations contained in Paragraphs 1 through 30 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

44. From at least in or about 2021 through at least in or about 2023, in the Southern District of New York and elsewhere, ROMAN SHAMALOV and IRINA POLVANOVA, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money or property by means of false and fraudulent pretenses, representations,

18

and promises, for the purpose of executing such scheme and artifice and attempting so to do, placed in a post office and authorized depository for mail matter, a matter and thing whatever to be sent and delivered by the Postal Service, and deposited and caused to be deposited a matter and thing whatever to be sent and delivered by a private and commercial interstate carrier, and took and received therefrom, such matter and thing, and knowingly caused to be delivered by mail and such carrier according to the direction thereon, and at the place at which it was directed to be delivered by the person to whom it was addressed, such matter and thing, to wit, SHAMALOV and POLVANOVA sold diverted, black-market medication on online pharmacy exchange platforms while representing that the medication was obtained through the traditional supply chain, and transmitted such medication by the United States mail to and from the Bronx, New York.

(Title 18, United States Code, Sections 1341 and 2.)

## COUNT FIVE
### (Conspiracy to Commit Money Laundering)

The Grand Jury further charges:

45.     The allegations contained in Paragraphs 1 through 30 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

46.     From at least in or about 2020 through at least in or about 2023, in the Southern District of New York and elsewhere, BORIS AMINOV, CHRISTY CORVALAN, IRINA POLVONOVA, and ROMAN SHAMALOV, the defendants, and others known and unknown, intentionally and knowingly combined, conspired, confederated, and agreed together with each other to violate Title 18, United States Code, Sections 1956(a)(1)(A)(i), 1956(a)(1)(B)(i) and 1957(a).

47.     It was a part and an object of the conspiracy that BORIS AMINOV, CHRISTY CORVALAN, ROMAN SHAMALOV, and IRINA POLVANOVA, the defendants, and others

known and unknown, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct a financial transaction, which in fact involved the proceeds of specified unlawful activity, to wit, mail fraud, in violation of Title 18, United States Code, Section 1341, wire fraud, in violation of Title 18, United States Code, Section 1343, and health care fraud, in violation of Title 18, United States Code, Section 1347, with the intent to promote the carrying on of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

48.     It was further a part and an object of the conspiracy that BORIS AMINOV, CHRISTY CORVALAN, ROMAN SHAMALOV, and IRINA POLVANOVA, the defendants, and others known and unknown, knowing that the property involved in a financial transaction represented the proceeds of some form of unlawful activity, would and did conduct and attempt to conduct a financial transaction, which in fact involved the proceeds of specified unlawful activity, to wit, mail fraud, in violation of Title 18, United States Code, Section 1341, wire fraud, in violation of Title 18, United States Code, Section 1343, and health care fraud, in violation of Title 18, United States Code, Section 1347, knowing that the transaction was designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

49.     It was further a part and an object of the conspiracy that BORIS AMINOV, CHRISTY CORVALAN, ROMAN SHAMALOV, and IRINA POLVANOVA, the defendants, and others known and unknown, within the United States, knowingly would and did engage and attempt to engage in a monetary transaction, as defined in Title 18, United States Code, Section 1957(f), in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activity, consisting of proceeds from mail fraud, in violation of Title 18, United

20

States Code, Section 1341, wire fraud, in violation of Title 18, United States Code, Section 1343, and health care fraud, in violation of Title 18, United States Code, Section 1347, in violation of Title 18, United States Code, Section 1957.

(Title 18, United States Code, Section 1956(h).)

## FORFEITURE ALLEGATIONS

50. As a result of committing the offense alleged in Count One of this Indictment, BORIS AMINOV, CHRISTY CORVALAN, IRINA POLVANOVA, ROMAN SHAMALOV, ANTONIO PAYANO, DAVID FERNANDEZ, and CRYSTAL MEDINA, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(7), and Title 28, United States Code, Section 2461(c), any and all property, real and/or personal, that constitutes or is derived from proceeds and gross proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense and the following specific property:

      a.  The real property described as 3184 Wissman Avenue, Bronx, New York.

      b.  The real property described as 3186 Wissman Avenue, Bronx, New York.

      c.  The real property described as a 2021 Mercedes-Benz Maybach S580 with vehicle identification number W1K6X7GB0MA003783.

      d.  The real property described as a 2021 Nissan GT-R with vehicle identification number JN1AR5BF4MM160036.

      e.  The real property described as a 2018 Mercedes-Benz C43 with vehicle identification number WDDWJ6EB2JF657374.

21

   f. The real property described as a 2017 Mercedes-Benz GLE635 with vehicle identification number 4JGDA7FBXHA814206.

   g. The real property described as a 2022 Honda Odyssey with vehicle identification number 5FNRL5H64FB115845.

  51. As a result of committing the offense alleged in Count Two of this Indictment, CHRISTY CORVALAN, IRINA POLVANOVA, DAVID FERNANDEZ, CRYSTAL MEDINA, JUAN HERNANDEZ, a/k/a "Pop," and ALBERT YAGUDAYEV, a/k/a "Jeff," shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 982(a)(7), and Title 28, United States Code, Section 2461(c), any and all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of said offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense and the specific property enumerated in paragraphs 50(a) through (g).

  52. As a result of committing the offense alleged in Count Four of this Indictment, IRINA POLVONOVA and ROMAN SHAMALOV, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all property, real and personal, involved in said offense, or any property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense.

  53. As a result of committing the offense alleged in Count Five of this Indictment, BORIS AMINOV, CHRISTY CORVALAN, IRINA POLVANOVA, and ROMAN SHAMALOV, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any and all property, real and personal, involved in said offense, or any

property traceable to such property, including but not limited to a sum of money in United States currency representing the amount of property involved in said offense and the specific property enumerated in paragraphs 50(a) through (g).

Substitute Assets Provision

54. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

      a.   cannot be located upon the exercise of due diligence;

      b.   has been transferred or sold to, or deposited with, a third person;

      c.   has been placed beyond the jurisdiction of the Court;

      d.   has been substantially diminished in value; or

      e.   has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 18, United States Code, Sections 981 and 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

FOREPERSON

DAMIAN WILLIAMS
United States Attorney

24