

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

April 10, 2024

**BY ECF**
Honorable Mary Kay Vyskocil
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

    **Re:**    *United States v. Boris Aminov*, **S1 23 Cr. 110 (MKV)**

Dear Judge Vyskocil:

    The Government respectfully submits this letter in advance of sentencing in this matter for defendant Boris Aminov (the "defendant"), which is scheduled for April 17, 2024. The defendant led and orchestrated a massive fraud that generated tens of millions of dollars in profits by exploiting vulnerable patients with HIV. The defendant's scheme caused financial harm to government insurance programs in excess of $13 million. In consideration of the gravity of the offense, the need for the sentence imposed to provide significant deterrence, and the other factors set forth in 18 U.S.C. § 3553(a), the Government respectfully submits that a Guideline sentence of 120 months' imprisonment is sufficient but not greater than necessary to achieve the purposes of sentencing in this case.

### A. Background

    i.  <u>The Offense Conduct</u>

        *a.  Overview of the Offenses*

    From at least in or about 2020 through at least in or about 2023, the defendant was a leader in a scheme that defrauded Medicaid, Medicare, and private insurance companies out of at least approximately $13 million through trafficking in black-market HIV medication. In doing so, he exploited at least hundreds of low-income individuals who had been prescribed HIV medication, jeopardizing the health and safety of those vulnerable patients. As described more fully below, the defendant occupied many roles in the scheme. He was a major supplier of black-market HIV medication to numerous pharmacies from which the fraud was perpetrated. And he submitted fraudulent billings to Medicaid and Medicare from at least one pharmacy under his direct control. The defendant also provided critical information to other co-conspirators about how to orchestrate and profit from the fraud.

### b. Background of the Regulation and Distribution of Prescription HIV Medication

Prescription medications are of critical importance to treating many types of diseases, including HIV, and therefore, the movement, storage, and sale of these medications is carefully regulated. To ensure their safety, prescription drugs are typically sent from the manufacturer to one of only a handful of authorized wholesale distributors, who, in turn, either sell the prescription medications directly to pharmacies, or sell those medications to other licensed wholesale distributors who, in turn, sell the medications to pharmacies for ultimate distribution to patients.

Prescription drug manufacturers additionally set standards for the safe handling of prescription medications. For example, many HIV medications must be stored at precise temperatures. These standards must be upheld by all distributors who handle, buy, and sell prescription medication along the traditional drug supply chain. Failure to comply with these standards can impact the efficacy of the drugs and the safety of the patients receiving them. Maintaining the integrity of the prescription drug supply chain is, therefore, critical to ensuring that all prescription drugs remain safe for human consumption by the time they are ultimately distributed to patients.

The United States Food and Drug Administration ("FDA") is charged with protecting the health and safety of the American public, including by regulating the manufacture, distribution, and dispensation of prescription drugs. The FDA regulates the manufacture, distribution, and dispensation of prescription drugs through a number of laws, including the Food, Drug, and Cosmetic Act ("FDCA"), the Drug Supply Chain Security Act ("DSCSA"), and the Prescription Drug Marketing Act ("PDMA").

In addition to regulation of the prescription drug supply chain, the price paid for prescription drugs is also carefully controlled. Drug manufacturers generally set a Wholesale Acquisition Cost ("WAC") for the prescription medication they sell, that is, a price they charge wholesale distributors before the application of any rebates, discounts, allowances, and other price concessions. There is little deviation from the WAC for name brand, non-generic drugs that remain under patent. For this reason, drug distributors or dispensers who purchase prescription medication from the legitimate, regulated drug supply chain are generally unable to purchase that medication for substantially lower than the WAC.

Prescription drug distributors and dispensers are generally only able to purchase drugs at prices significantly below the WAC when they obtain those drugs through means outside the legitimate, regulated drug supply chain. The term prescription drug "diversion" describes prescription drugs that are removed or "diverted" from the chain of lawful manufacturers, distributors, and dispensers. Prescription drug diversion typically occurs through several different unlawful means, including theft, fraud, or purchases also known as "buy-backs" from individual patients who never consumed the drugs they were prescribed. Diverted prescription drugs are often obtained and unlawfully resold by unlicensed distributors to other unlicensed distributors, or directly to pharmacies, who ultimately dispense the diverted medication to patients.

By purchasing diverted medication, wholesale distributors and dispensers, such as pharmacies, are often able to obtain prescription drugs for substantially less than the WAC. However, when pharmacies submit a claim to Medicare or Medicaid, they receive the same amount

of money in reimbursement, generally a payment at or near the stated WAC for a particular prescription drug, regardless of what they ultimately paid for the prescription drug. Purchasing diverted medication at lower cost outside the regulated supply chain, therefore, enables the pharmacy to earn a larger profit on each prescription medication it dispenses.

Prescription drug diversion, while profitable for unscrupulous wholesale distributors and pharmacies, disrupts the integrity of the regulated prescription drug supply chain. When prescription drug diversion occurs, the FDA is unable to properly monitor the manufacture, distribution, and dispensation of prescription drugs. Many diverted medications, therefore, lack indicia of authenticity or proper quality control. This lack of regulation puts patient health and safety at risk.

(*See* Final Presentence Investigation Report dated March 1, 2024 ("PSR") ¶¶ 17-24).

> ### c.   Boris Aminov was a Leader and Orchestrator of the HIV Medication Diversion Scheme

The defendant functionally operated Bless You Rx, a pharmacy in Jamaica, New York, which was owned "on paper" by the defendant's mother. Through this pharmacy, the defendant billed Medicare and Medicaid millions of dollars for HIV medication that had been acquired from black-market sources. The scale of the defendant's involvement in the fraud, however, far-exceeded the activities perpetrated from his own pharmacy. The defendant also was a major distributor of black-market HIV medications to pharmacies that were owned and operated by other co-defendants, including Christy Corvalan (the "Corvalan Pharmacies"), Irina Polvanova (the "Polvanova Pharmacy"), and Roman Shamalov (the "Shamalov Pharmacy"). After purchasing black-market medication from the defendant, Corvalan, Polvanova and Shamalov then dispensed that medication to patients of their own pharmacies or otherwise distributed it to other pharmacies.

When enrolling in Medicare and Medicaid programs, pharmacies must attest that they will only submit insurance reimbursement claims for medication that was obtained and dispensed in full compliance with all applicable state and federal laws, including the FDCA and the DSCSA. However, the medication for which the pharmacies involved in the fraud often billed government insurance was obtained outside the regulated supply chain and dispensed in violation of those applicable laws.

As noted above, the defendant supplied diverted black-market medication to, among others, the Corvalan Pharmacies, the Shamalov Pharmacy, and the Polvanova Pharmacy. The defendant supplied these pharmacies with diverted black-market medication at prices substantially below the WAC, so that the pharmacies could profit from the reimbursement payments they received from Medicare, Medicaid, other insurance, or selling to other pharmacies. For example, Corvalan and others used the Corvalan Pharmacies to consistently bill their patients' government insurance for the full value of the HIV medication dispensed to patients, and in turn, collected the full amount of money paid by government insurance for that medication. However, rather than purchase medication from authorized and legitimate distributors of HIV medication, Corvalan instead purchased diverted HIV medication from black-market sources, including the defendant, and distributed that potentially unsafe medication to patients. The fraudulent scheme generated huge profits for the defendant as the black-market medication wholesaler, and the pharmacy

employees as the retailers of the black-market medications. Specifically, there was a profit margin of as much as approximately $3,000 for each monthly prescription that was filled.

Moreover, the defendant knew that the quality and condition of the diverted HIV medication that he was selling to pharmacies and distributing to patients was potentially dangerous. As a result, the defendant and other pharmacy employees who distributed the medication took steps to make the bottles of diverted medication falsely appear that they were new and in proper condition. For example, on October 20, 2020, Corvalan sent a WhatsApp message, which attached the photograph below of a bottle of the HIV medication Tivicay to the defendant, in which Corvalan explained to the defendant that he had already sold her too many degraded and inauthentic bottles of medication that required alteration in order to appear legitimate, and she was unwilling to take this additional specific bottle because of its especially-poor quality and condition: "I was going to keep it but I really can't ... I already have enough bad ones to work with."[1]



In another example from October 21, 2020, Corvalan wrote to Aminov, "I don't want that it's not good," along with another photograph of a bottle of diverted HIV medication, as shown below.

---

[1] All of the messages and photographs referenced in the Government's submission were produced to the defendant in Rule 16 discovery.



Polvanova and Shamalov engaged in similar schemes out of their pharmacies. Specifically, the Polvanova Pharmacy consistently billed its patients' government insurance for the full value of the HIV medication it dispensed to them. However, rather than obtain all prescription medication from legitimate sources, Polvanova instead purchased diverted black-market HIV medication from the defendant at a fraction of the WAC. Likewise, Shamalov purchased hundreds of thousands of dollars in diverted black-market HIV medication from the defendant. For example, in the WhatsApp messages shown below, Aminov provided to Shamalov the prices of bulk quantities of the diverted HIV medications Biktarvy, Genvoya and Odefsey, that could then be dispensed to patients instead of legitimately-sourced medications.



(owner)
To: 19176854664@s.whatsapp.net Roma Shamalov

Bika 44*875=38500
Gena 21*875=18375
Odel 10*1000=10000
Plus 900 from last time
Total 67775

| Participant | Delivered | Read | Played |
|---|---|---|---|
| 19176854664@s.whatsapp.net Roma Shamalov | 7/23/2021 5:34:59 PM(UTC+0) | 7/23/2021 5:42:47 PM(UTC+0) | |

Status: Sent
Platform: Mobile

7/23/2021 5:34:58 PM(UTC+0)

Source Extraction:
Legacy (3)

649



(owner)
To: 19176854664@s.whatsapp.net Roma Shamalov

Can you be in my place around 5-5:30?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| 19176854664@s.whatsapp.net Roma Shamalov | 7/23/2021 5:35:31 PM(UTC+0) | 7/23/2021 5:42:47 PM(UTC+0) | |

Status: Sent
Platform: Mobile

7/23/2021 5:35:30 PM(UTC+0)

Source Extraction:
Legacy (3)



(owner)
To: 19176854664@s.whatsapp.net Roma Shamalov

Can you be in my place around 5-5:30?

| Participant | Delivered | Read | Played |
|---|---|---|---|
| 19176854664@s.whatsapp.net Roma Shamalov | 7/23/2021 5:35:31 PM(UTC+0) | 7/23/2021 5:42:47 PM(UTC+0) | |

Status: Sent
Platform: Mobile

7/23/2021 5:35:30 PM(UTC+0)

Source Extraction:
Legacy (3)



(*See* PSR ¶¶ 25-37).

>    d.  The Scheme's Victims

This diversion scheme had two sets of victims: government insurance programs and the patients of the pharmacies.

*First*, Medicaid and other government insurance programs were defrauded out of at least approximately $13 million in payments that they made to Bless You Rx, and the Corvalan and Polvanova Pharmacies. Medicaid and other government insurance programs paid these pharmacies based on false representations by the pharmacies that the medication for which they were seeking reimbursement was procured and distributed in compliance with all applicable federal and state laws, including the FDCA and the DSCSA.

*Second*, the scheme exploited low-income HIV patients of these pharmacies, and in the process, potentially put those vulnerable patients' health and safety at risk. Modern HIV medication is very effective at controlling the symptoms of HIV. However, effective HIV treatment requires strict adherence to a prescribed medication regimen, with patients needing to take specific doses of specific medications at specific times. By purchasing diverted HIV medication from black-market sources instead of through legitimate distributors, the pharmacies could not assure the quality or condition of the medication they provided to their patients, thereby creating a risk that patients would receive counterfeit, expired, or improperly dosed medication.

Moreover, as a major trafficker in black-market HIV medication, the defendant acquired medication he eventually distributed to pharmacies that had been bought back from low-income and vulnerable HIV patients that needed the medication to control their HIV infections. Many HIV patients are low-income individuals suffering from drug dependencies. The diversion scheme encouraged these patients to sell their monthly supply of medication for a few hundred dollars, so that the defendant and others could make thousands in profit from that single monthly supply of pills. While the Government's investigation does not show that the defendant directly purchased medication back from patients, it establishes the defendant's participation in a black-market medication ecosystem that preyed on these vulnerable patients.

The defendant illegally procured HIV medication along with his co-defendant, Jonathan Gavrielof, that was then distributed to patients. Gavrielof was also a manager at Bless You Rx. In the WhatsApp message below, Gavrielof sent the accompanying pictures of black-market HIV medications along with a list of such medications that could be acquired, to which the defendant replied "ok." The medication bottles are visibly used and adulterated.



 

In another example shown below, Gavrielof provided a breakdown of the HIV medication that he and the defendant sold together and told the defendant that he owed the defendant $5,825.00



(*See* PSR ¶¶ 38-43).

*e.  The Defendant Laundered Proceeds from the Diversion Scheme*

As explained below, the defendant used a network of shell companies to launder his proceeds from the diversion scheme.

Over the duration of the diversion scheme, Corvalan used the Corvalan Pharmacies to pay more than $6 million to the defendant, presumably in exchange for the black-market medication that he sold to her to distribute to her pharmacies' patients. To conceal those payments, the defendant provided Corvalan with the information for certain shell companies, to which Corvalan wrote handwritten checks from the Corvalan Pharmacies. Those checks were then cashed at a single check-cashing store located in New Jersey.

For example, the images below are screenshots of WhatsApp messages in which Aminov provided figures typed on a calculator that indicate the amount of money he was owed by Corvalan, and the names of shell companies to make those payments to.





Likewise, Polvanova used the Polvanova Pharmacy to transfer almost $2 million in proceeds from the scheme to the defendant's network of shell companies. Specifically, Polvanova made payments via handwritten check to the same shell companies that Aminov had identified for Corvalan. During the scheme, Polvanova and the defendant communicated regularly about the flow of illegal proceeds from the Polvanova Pharmacy bank account to certain shell companies identified by the defendant.

Additionally, Shamalov used the Shamalov Pharmacy to pay hundreds of thousands of dollars to the defendant for diverted medication. To conceal the payments that Shamalov was making to the defendant, the defendant instructed Shamalov to make payments to some of the same shell companies to which the defendant also instructed Corvalan and Polvanova to make payments.

(*See* PSR ¶¶ 45-47).

> f.   *The Search of the Defendant's Townhouse and the Scale of the Defendant's Fraudulent Conduct*

On the morning of the defendant's arrest on March 2, 2023, the Government executed a search warrant of a three-story townhouse in queens that was not the defendant's residence, but rather, was the location from which the defendant orchestrated the fraud (the "Townhouse"). In that search, the Government found stockpiles of black-market and potentially dangerous HIV medications. The medication bottles contained labels in the names of patients of many different pharmacies, indicating they had been bought from patients for re-sale to other unknowing patients. The Government also recovered printing labels, lighter fluid, and other materials used to alter medication bottles for illegal re-sale. For example, lighter fluid is commonly used in diversion schemes like the defendant's to strip the adhesive from labels on medication bottles, so that the labels can be removed without patients detecting that the medication had previously been prescribed to others. The Government also recovered $318,393.00 in cash from two large safes in the Townhouse, as well as firearms and ammunition. The photographs below show some of the medication stockpiles, materials used to alter adulterated medication bottles, and weapons found in the defendant's Townhouse.














The total loss amount attributable to the defendant through his orchestration of this sprawling fraud scheme is at least $13,270,379.50. That loss amount is derived from a financial analysis which includes the $6 million the Corvalan Pharmacies paid to the shell companies provided by the defendant for the black-market HIV medications; estimates of loss from Bless You Rx which calculate the discrepancy of what the defendant billed to Medicare and Medicaid for HIV medication contrasted with the actual amount of HIV medication he purchased from legitimate medication wholesalers; and the black-market HIV medications the defendant supplied to other pharmacies, including those owned by Polvonova and Shamalov.

(*See* PSR ¶ 48).

iii. Procedural History

On February 28, 2023, a grand jury returned an indictment charging the defendant with conspiracy to commit wire fraud and health care fraud, in violation of 18 U.S.C. § 1349, and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). The defendant was arrested on March 2, 2023 along with four other scheme participants who were affiliated with the Corvalan Pharmacies. On October 17, 2023, a grand jury returned a superseding indictment charging the defendant with an additional count of conspiracy to defraud the United States, in violation of 18 U.S.C. § 371. Six other co-defendants were charged in the Superseding Indictment, including Polvonova, Shamalov and Gavrielof.

On December 11, 2023, the defendant pleaded guilty to Count One of the Superseding Indictment, specifically conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 1349, pursuant to a plea agreement with the Government (the "Plea Agreement"). As part of the Plea Agreement, the defendant stipulated that, as part of the scheme, he caused patients with HIV to receive illegally-sourced, black-market prescription HIV medication, and that the Court may consider that conduct in imposing a sentence.

The Plea Agreement calculated a Guidelines range of 151 to 188 months' imprisonment, based on an offense level of 34 and a criminal history category of I. The Plea Agreement included a stipulated loss amount of $13,270,379.50. The Plea Agreement also contains enhancements for the scheme involving a large number of vulnerable victims, using sophisticated means, and the defendant's role as an organizer, leader, manager or supervisor in the criminal activity.

Pursuant to U.S.S.G. §§ 5G1.1(a) and (c), because the statutorily authorized maximum sentence for Count One is 120 months' imprisonment, the parties agreed that the Guidelines sentence is 120 months' imprisonment (the "Stipulated Guidelines Sentence").

On March 1, 2024, the United States Probation Office ("Probation Office") issued its final PSR for the defendant. That report calculated the same Guidelines Range and Stipulated Guidelines Sentence as those contained in the Plea Agreement. The Probation Office recommends a sentence of 84 months' imprisonment.

**B. Discussion**

    i.  <u>Applicable Law</u>

Following *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone.  Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker*, 543 U.S. at 264.  As the Supreme Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States,* 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7).  *See Gall,* 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant;

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

    ii.  <u>A Sentence of 120 Months' Imprisonment Is Appropriate</u>

The Court should impose a Guideline sentence of 120 months' imprisonment. Such a sentence is necessary given the seriousness of the offense, the need to promote respect for the law and to provide just punishment, to afford adequate deterrence to criminal conduct, and in consideration of the characteristics of the defendant.

    *a.  The Seriousness of the Offense*

The defendant's crimes were extraordinarily serious. The defendant was a leader in a massive fraud that defrauded Medicaid and Medicare of tens of millions of dollars. He utilized shell companies to conceal the illegal proceeds of his fraud over the course of several years.  But

most importantly, this was not a garden-variety fraud that posed only financial harm to its victims. On the contrary, the fraud here was uniquely insidious in that it exploited and put at risk vulnerable patients with HIV. These patients needed the medications that were the currency in the defendant's fraud to control their infections. These medications were of vital importance to those patients' health and safety. The defendant profited from the scheme that incentivized these patients, who were often-impoverished, to sell-back their life saving medications in exchange for small but much needed amounts of money. The defendant and others then turned a profit by prescribing those medications to other unknowing patients, instead of sourcing medication from authorized and legitimate wholesalers. As described above, the defendant reaped significant profits. Typically, a patient would sell their medications for only a few hundred dollars to aggregators on the street or other scheme participants. The pharmacies could then bill Medicaid and Medicare upward of $3,000 for that single monthly prescription. The defendant's conduct was not driven by financial desperation, but instead by greed and a desire to make money. And in that pursuit, the defendant put in jeopardy the health and safety of both the patients who sold back their medication for a small monthly fee, and to the patients who were then unknowingly prescribed the black-market diverted medication instead of legitimately-sourced, unadulterated medication.

The defendant's role in the scheme was far reaching. For example, the defendant enlisted others into the scheme, such as Jonathan Gavrielof, who first worked as a pharmacy manager at Bless You Rx, and then worked with the defendant to procure black-market medication in bulk and distribute it to several other pharmacies. The scale of the defendant's involvement in the scheme is also evident from the stockpiles of illegal medications seized from his Townhouse, the numerous text messages with Corvalan, Shamalov and Gavrielof showing his role in procuring and selling large quantities of black-market medication, and the defendant's receipt of payments exceeding $8 million from Corvalan, Polvanova and Shamalov through a network of shell companies.

The defendant's participation in the scheme did not end there. Other WhatsApp messages show the defendant's vital role as a source of information for others participating in the fraud. Many pharmacies engaged in the scheme continually changed ownership so that irregular billing patterns for HIV and other medications would not be noticed by insurance companies, regulators, or law enforcement. Corvalan, for example, operated one pharmacy for approximately two years, then changed operations to a different pharmacy, presumably to avoid detection. Messages between Corvalan and the defendant show not only the defendant selling Corvalan diverted medication, but also providing guidance and information to Corvalan regarding other pharmacies that might be for sale for Corvalan to buy, as well as leads on where she could find pharmacists to work at her pharmacy that wouldn't scrutinize her operations.

In sum, the defendant played a vital role as a leader in a massive scheme that put vulnerable patients with a life-threatening illness in danger. A Guideline sentence of 120 months is needed to account for this conduct.

> b. *The Defendant's Sentence Must Provide Adequate Specific and General Deterrence*

The defendant's scheme employed sophisticated means and was difficult to detect. He utilized at least 17 different shell companies to hide the proceeds of his fraud. The defendant and his co-conspirators constantly closed and opened pharmacies so that irregular billing patterns would not be detected and to seek to evade detection from law enforcement. Additionally, the defendant developed special knowledge and skills regarding the cleaning and re-packaging of prescription medication bottles so that the fraud would go unnoticed from the patients receiving the black-market medication. A substantial sentence is needed to demonstrate that when these types of sophisticated criminal enterprises are detected and disrupted, the consequences will be severe. An appropriate sentence must also send a message that frauds such as these that specifically prey upon vulnerable individuals will be met with a substantial prison sentence.

Of critical importance here, the defendant already received a substantial benefit in being offered a plea agreement that limited his maximum exposure to 10 years' imprisonment. The defendant's exposure under the applicable Guidelines were much higher than that, specifically 151 to 188 months' imprisonment.  Therefore, the sentence the Government is requesting is already 31 months less than the low end of the applicable Guidelines range. The defendant was indicted on two other counts that carried maximum sentences of 20 years' imprisonment, specifically conspiracy to commit wire fraud and conspiracy to commit money laundering. The defendant's plea agreement already provided him a significant benefit in consideration of the applicable Guidelines range and his incredibly serious and harmful fraud. Even accounting for the mitigating factors raised by the defendant in his sentencing submission, any further reduction in sentence would not achieve the aims of sentencing.

## C.  Conclusion

The defendant's sentence must reflect the uniquely harmful fraud that he led and organized. It must provide adequate deterrence to those that contemplate similar harmful conduct that exploits vulnerable HIV patients. A sentence of 120 months is sufficient but not greater than necessary to achieve the purposes of sentencing in this case.


Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York


by: _____
       Jeffrey W. Coyle
       Assistant United States Attorney
       (212) 637-2437


Cc:    James Kousouros, Esq.
         David Eskew, Esq.