O4GUAMIS

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4                    v.                          23 Cr. 110 (MKV)

5    BORIS AMINOV,

6                                                Sentence
                     Defendant.
7
     ------------------------------x
8
                                                New York, N.Y.
9                                               April 17, 2024
                                                2:00 p.m.
10

11   Before:

12                   HON. MARY KAY VYSKOCIL,

13                                               U.S. District Judge

14                            APPEARANCES

15   DAMIAN WILLIAMS
          United States Attorney for the
16        Southern District of New York
     BY:  JEFFREY W. COYLE
17        Assistant United States Attorney

18   ABELL ESKEW LANDAU, LLP
          Attorneys for Defendant
19   BY:  DAVID M. ESKEW

20   JAMES KOUSOUROS
          Attorney for Defendant
21

22
     Also Present:
23
          Nelly Alishaev, Interpreter (Russian)
24        FBI Special Agent Marshall Scarbro

25

O4GUAMIS

1    (Case called)

2            THE COURT:  Please be seated everyone.

3            THE DEPUTY CLERK:  Counsel, starting with the

4    government, please state your name for the record.

5            MR. COYLE:  Good afternoon, your Honor.

6            Jeff Coyle for the government.

7            I'm joined at counsel table by Special Agent Marshall

8    Scarbro from the FBI.

9            THE COURT:  All right.  Good afternoon, Mr. Coyle.

10           And good afternoon, Special Agent Scarbro.

11           MR. ESKEW:  Good afternoon, your Honor.

12           David Eskew, Abell Eskew Landau, on behalf of the

13   defendant, Boris Aminov, who is seated to my left.

14           THE COURT:  All right.  Good afternoon to you,

15   Mr. Eskew.

16           And good afternoon to you, Mr. Aminov.

17           MR. KOUSOUROS:  And, your Honor, James Kousouros also

18   counsel on behalf of Boris Aminov.

19           Good afternoon.

20           THE COURT:  Good afternoon to you, sir.  I didn't mean

21   to skip over you.

22           MR. KOUSOUROS:  That's okay.  I'm hiding.

23           THE COURT:  Behind the screen, you are.

24           All right.  And good afternoon to our court reporter

25   as well.  Thank you.

O4GUAMIS

1          So good afternoon, everyone.

2          I am Judge Vyskocil.  I've been presiding over this

3   case and we're here this afternoon for the purpose of

4   sentencing Mr. Aminov.

5          So let me just begin, Mr. Aminov, I want to confirm

6   you do speak and understand English clearly and do not need the

7   services of an interpreter?

8          THE DEFENDANT:  Yes, I do.

9          THE COURT:  You do?

10          THE DEFENDANT:  I speak English as well.

11          THE COURT:  And you do not need an interpreter?

12   Because I'm recalling correctly at your plea, we had somebody

13   on standby.

14          We do?  I'm sorry.  I didn't see you there, behind my

15   screen.

16          THE DEFENDANT:  Thank you.

17          THE COURT:  All right.  You're welcome.

18          And let me ask the government, are there any

19   individual victims entitled to notice and has notice been

20   given?

21          MR. COYLE:  Notice has been made to victims, your

22   Honor.

23          THE COURT:  All right.  Thank you.

24          So by way of background on October 26th of 2023,

25   Mr. Aminov appeared before me for arraignment.  At that time,

O4GUAMIS

1    he pled not guilty to the counts in the S1 superseding

2    indictment that contained charges against him.  Those were

3    Counts One, Three, and Five of the superseding indictment.

4            On December 11th of last year he withdrew his plea

5    of not guilty and he entered a plea of guilty pursuant to an

6    agreement with the government to Count One only of that S1

7    superseding indictment which charged him with conspiracy to

8    commit wire fraud in violation of Title 18, United States Code,

9    Section 1349.

10           Since that date the probation office has completed its

11   investigation and all of the parties have filed their

12   sentencing submissions with the Court.

13           So let me begin by noting what I have before me that

14   is part of the record that I considered in connection with

15   today's sentencing:  I have the final presentence report filed

16   by the probation office on March 1, 2024, that's at

17   ECF No. 193.  Now, I would note the probation office made a

18   number of revisions to that PSR at the request of -- both sides

19   made requests for revisions.

20           Excuse me one second.

21           It's my understanding that originally the defense had

22   an objection which it submitted to the probation office in a

23   letter dated February 16th of 2024.  That's noted on page 22

24   of the PSR, and it's my understanding that probation did make

25   revisions in connection with the defense's objection.  Is that

O4GUAMIS

1    accurate, Counsel?

2              MR. ESKEW:  Yes, your Honor.

3              THE COURT:  So there are no outstanding objections to

4    the PSR?

5              MR. ESKEW:  There are no outstanding objections to the

6    PSR, your Honor.

7              THE COURT:  All right.  And thank you.

8              And the government has no objections, correct?

9              MR. COYLE:  No, your Honor.

10             THE COURT:  All right.  And I have as well the

11   defendant's sentencing submission which was filed on

12   April 3rd.  That's at ECF No. 205.  That contained or

13   attached a number of exhibits, certain portions of which have

14   properly been redacted.  And Exhibits 24 and 25 are filed under

15   seal and will be maintained by the Court that way.  The

16   attachments include 25 letters of support.  There are also

17   excerpts from the transcript of the plea hearing which, of

18   course, is on the docket, so I didn't need those attached as

19   exhibits, and then there are certain health records of

20   Mr. Aminov and, those would be the ones that are redacted

21   and/or filed under seal.  And as I say, they will be maintained

22   that day.  Finally, I have the government's sentencing

23   submission filed on April 10th of 2024.  That's at

24   ECF No. 209.

25             So let me just pause and confirm that that was the

O4GUAMIS

1     entirety of the record before the Court?  Mr. Coyle?

2             MR. COYLE:  That's is correct, your Honor.

3             I did just want to clarify one point in the lead-up to

4     the things that were considered:  Count One of the indictment

5     charged Mr. Aminov with conspiracy to commit both wire fraud

6     and healthcare fraud in violation of 34 -- 13 -- 18, U.S.C.,

7     1349 and he pleaded guilty to the healthcare fraud conspiracy

8     object, not the wire fraud conspiracy.

9             THE COURT:  That is consistent with my recollection.

10            MR. COYLE:  Thank you, your Honor.

11            THE COURT:  Agreed, Counsel?

12            MR. ESKEW:  Yes, Judge.

13            THE COURT:  All right.  Thank you.

14            You are right and I appreciate the clarification for

15    the record.

16            All right.  And you confirm that is the entirety of

17    what's before me?

18            MR. COYLE:  Yes, your Honor.

19            THE COURT:  All right.  Mr. Eskew?

20            MR. ESKEW:  Yes, your Honor.

21            THE COURT:  All right.  So then let me just ask you,

22    Mr. Eskew, that you have had a full opportunity to read and

23    review the PSR to talk about it with Mr. Aminov and to lodge

24    any objections that you or he believe are appropriate?

25            MR. ESKEW:  Yes, Judge, we've had that opportunity.

O4GUAMIS

1          THE COURT:  All right.  Mr. Aminov, have you reviewed

2     the PSR with your counsel and had an opportunity to make any

3     comments or ask him to lodge any objections that you believe

4     are in order?

5          THE DEFENDANT:  Yes, I did, your Honor.

6          THE COURT:  Thank you.

7          And has the government reviewed the PSR and tendered

8     any objections it thought needed to be made?

9          MR. COYLE:  It has, your Honor.

10         THE COURT:  All right.  A few questions for the

11    parties:  First, with respect to forfeiture, Mr. Aminov did

12    admit in his plea agreement with the government to the

13    forfeiture allegation with respect to Count One of the

14    indictment and he agreed to forfeit to the United States

15    pursuant to 18, United States Code, Section 982(a)(7), a sum of

16    money equal to $4,401,495, representing proceeds traceable to

17    the commission of the offense to which he pled and all right,

18    title, and interest in certain specific property that is listed

19    in the order, specifically, $298,393 that was recovered from

20    86-09 66th Avenue in Rego Park, New York on March 2, 2023.

21    At the plea hearing, I signed a consent preliminary order of

22    forfeiture as to specific property and money judgment and that

23    order is on the docket at ECF No. 156.  It will be incorporated

24    into the judgment that I enter after today's hearing.

25         All right.  In addition, the plea agreement provides

O4GUAMIS

| 1 | that Mr. Aminov agrees to make restitution in the amount of |
| 2 | $13,270,379.50.  I believe the parties have now submitted an |
| 3 | order of restitution which provides for restitution in that |
| 4 | amount and it includes a schedule of payment. |
| 5 | This is on consent, Counsel?  Mr. Eskew? |
| 6 | MR. ESKEW:  Yes, Judge.  As part of plea agreement, |
| 7 | the defendant consented to the entry of a restitution judgment. |
| 8 | THE COURT:  All right.  Mr. Aminov, you've reviewed |
| 9 | this consent order with your counsel and you do consent to pay |
| 10 | restitution or be obligated for restitution in this amount? |
| 11 | THE DEFENDANT:  Yes, I did, your Honor. |
| 12 | THE COURT:  All right.  And that obligation is joint |
| 13 | and several, is it not? |
| 14 | MR. ESKEW:  Yes, Judge, it is. |
| 15 | THE COURT:  Does the order so provide? |
| 16 | MR. ESKEW:  I believe it does. |
| 17 | THE COURT:  It's just been handed to me.  It says |
| 18 | restitution is not joint and several with any other defendants. |
| 19 | The single sentence at the end of paragraph 1 says that. |
| 20 | Mr. Coyle? |
| 21 | MR. COYLE:  Yes, I believe that is correct, your |
| 22 | Honor. |
| 23 | THE COURT:  That is not joint and several? |
| 24 | MR. COYLE:  Correct, your Honor, although -- can I |
| 25 | have one moment to discuss with counsel? |

O4GUAMIS

1            THE COURT:  Please.

2            (Counsel confer)

3            MR. COYLE:  Your Honor, the parties will submit an

4    amended order specifying joint and several with certain

5    defendants under the indictment but certainly not all.  We'll

6    do that by the end of the day today, your Honor.

7            THE COURT:  All right.  Thank you.  Because I should

8    sign this and enter it, you know, shortly within the vicinity

9    of entry of the judgment, and I do try to get the judgment

10   entered promptly after sentencing.

11           MR. COYLE:  Absolutely, your Honor.  With respect to

12   restitution, I believe the Court has actually does have a few

13   months to do that but by the end of the day, I'll --

14           THE COURT:  Correct.  I like to do it promptly and I

15   like to be sure it's on consent, which is why I ask these

16   questions at sentencing.

17           MR. COYLE:  Absolutely.

18           THE COURT:  All right.  So it is joint and several

19   with several other defendants, in other words, right?

20           MR. COYLE:  Correct, your Honor.

21           THE COURT:  All right.  I'll wait to hear from the

22   parties with respect to that.

23           All right.  Now, with respect to the amendments that

24   were made at the conclusion of last year, the 2023 amendments

25   that the sentencing guidelines, I want to just confirm that the

O4GUAMIS

1    parties are in agreement that Mr. Aminov does not qualify for

2    the two-level offense calculation reduction for a zero-point

3    defendant because he did receive certain other adjustments for

4    in particular vulnerable victims and aggravating role in the

5    commission the offense.

6            MR. COYLE:  That is the government's position, your

7    Honor.

8            THE COURT:  All right.  Mr. Eskew?

9            MR. ESKEW:  Yes, Judge.  That was part of our plea

10   agreement and the stipulated plea that we've entered into does

11   not provide for that two-level adjustment.

12           THE COURT:  So you agree?

13           MR. ESKEW:  Yes.

14           THE COURT:  Thank you.

15           MR. ESKEW:  Judge, can I just go back to the

16   forfeiture?  I don't want to interrupt your Honor.

17           THE COURT:  Yes.

18           MR. ESKEW:  I think, and I may have gotten it wrong, I

19   think when you were discussing the forfeiture judgment you

20   mentioned the amount that was seized as 293,000 and change, and

21   that is an old number that I believe the government submitted

22   an amended consent judgment.  The amount should be 318,393.  I

23   just wanted to make sure.

24           THE COURT:  I'm sorry.  Tell me the amount again.

25           MR. ESKEW:  $318,393 was the amount that was seized,

O4GUAMIS

1    and that is what's reflected in the consent judgment that I

2    have.

3                THE COURT:  Is that what you were looking for,

4    Mr. Coyle?

5                MR. COYLE:  I was looking around for that, your Honor,

6    and that is correct, docketed at document No. 156 is the

7    consent offered forfeiture the total is 318,000 --

8                THE COURT:  Where is that in this order?

9                Here it is.  Okay.  $318,393.  Correct.

10                MR. COYLE:  Correct, your Honor.  And that is also the

11    number reflected in the signed plea agreement.

12                THE COURT:  All right.  I appreciate that, Mr. Eskew.

13    Thank you.

14                Next, have you, Mr. Eskew, reviewed with Mr. Aminov

15    the proposed standard mandatory and special conditions of

16    supervised release, and are you comfortable with my referring

17    to those conditions proposed in the PSR simply as mandatory and

18    standard conditions without putting them on the record

19    verbatim?

20                MR. ESKEW:  Yes, Judge.

21                THE COURT:  All right.  And have you specifically

22    reviewed the proposed special conditions of supervised release

23    with Mr. Aminov?

24                MR. ESKEW:  Yes, Judge.  We've gone over the PSR in

25    detail and he's reviewed it.

O4GUAMIS

1        THE COURT:  All right.  But in particular I'm asking

2    you now about the special conditions.

3        MR. ESKEW:  Yes, Judge.  And, in fact, you know, we

4    will be requesting that he be permitted to -- or that your

5    Honor recommend the RDAP program and so one of those special

6    conditions is regarding his drug and alcohol treatment program

7    as part of his sentencing, and we would like that to continue,

8    Judge, as part of his special conditions.

9        THE COURT:  Okay.  So, Mr. Aminov, I am -- you can

10   stay seated, sir -- I'm obligated to review with you

11   specifically the special conditions and put those on the

12   record, but did you review with your counsel all of the

13   conditions including the mandatory and standard conditions?

14       THE DEFENDANT:  Yes, your Honor.

15       THE COURT:  And the special conditions?

16       THE DEFENDANT:  Yes, your Honor, I did.

17       THE COURT:  All right.  So probation proposes and I

18   would intend to impose the following special conditions during

19   any term of supervised release:  First, that you be obligated

20   to participate in an outpatient treatment program approved by

21   the United States Probation Office, which program may include

22   testing to determine whether you've reverted to using drugs or

23   alcohol, and you would be obligated to contribute to the cost

24   of those services based on your ability to pay and/or the

25   availability of any third party payments, meaning insurance, in

O4GUAMIS

1    other words, and I would, in the order, authorize the release

2    of any available drug treatment evaluation or reports including

3    the presentence report to the provider of the substance use

4    disorder program.  In addition, you must provide the probation

5    officer with access to any financial information that might be

6    requested --

7             Just give me one moment.

8             -- with respect to --

9             And you must not incur any new credit card charges or

10   open any additional lines of credit without the approval of the

11   probation office unless you're in compliance with your payment

12   schedules for forfeiture and restitution.  I find this

13   condition justified in light of the nature of the crime to

14   which you are pleading guilty or you have pled guilty and in

15   order to ensure that there is not similar conduct in the

16   future.  I also find it justified in light of the very

17   significant amount of forfeiture and restitution that you are

18   required to pay.

19            Probation also proposes and I would intend to order

20   that you must participate in an outpatient mental health

21   treatment program approved by the United States Probation

22   office and continue to take any prescribed medication unless

23   instructed otherwise by your healthcare provider and here too

24   you would be obligated to contribute to the costs of services

25   based on your ability to pay and the availability of third

O4GUAMIS

 1  party payments and here too I would authorize the release of

 2  available psychological and psychiatric evaluations and reports

 3  and the health -- and the presentence report to the healthcare

 4  provider.  I find that both this condition and the outpatient

 5  drug and alcohol treatment program are warranted in light of

 6  your own professed history of substance abuse and the mental

 7  health issues that you've been struggling with.  So it would be

 8  my intent to impose each of those special conditions.  I

 9  would --

10      Well, Counsel, I'm interested in you telling me, is

11  there a need to include in the treatment program for drug and

12  alcohol that there be attention given to gambling issues as

13  well?

14      MR. ESKEW:  Judge, I don't think so.  In my

15  conversations with Mr. Aminov, that seemed to be something that

16  it was cabined off in his life that he had a professed gambling

17  issue at one time and was spending too much money doing those

18  kinds of activities but he has gotten that under control and it

19  has not been an issue of late.  I think it's more the mental

20  health treatment and the drug and alcohol -- really alcohol,

21  it's not really drugs, that he has been benefited from

22  presentencing and will continue to benefit from in the future.

23      THE COURT:  All right.  I will -- Mr. Aminov, do you

24  agree with that?  Do you feel you've gotten the gambling issues

25  under control?

O4GUAMIS

1          THE DEFENDANT:  Yes.

2          THE COURT:  All right.  I will not particularize that,

3    but I will impose the special conditions that were proposed by

4    probation and which you seem to yourself say you think would be

5    beneficial to you.  I won't specify gambling, but I will

6    encourage you in the strongest terms that you be honest with

7    your treatment providers, and if there is an issue, you share

8    that with them so that they can try to help you deal with it.

9    Understood?

10          THE DEFENDANT:  Yes, I understand.

11          THE COURT:  So are there any objections to those

12   proposed special conditions, Mr. Eskew?

13          MR. ESKEW:  No objection.

14          THE COURT:  And does the government still agree that

15   Mr. Aminov is entitled to a two-level reduction in the

16   calculation of his offense level by reason of his clearly

17   demonstrated acceptance of responsibility?

18          MR. COYLE:  It does, your Honor.

19          THE COURT:  All right.  And does the government intend

20   to move for a further one level reduction pursuant to

21   Section 3E1.1(b) by reason of Mr. Aminov's timely notice of

22   intent to plead guilty?

23          MR. COYLE:  The government so moves at this time.

24          THE COURT:  All right.  The motion granted.  And I

25   will tell that you in doing my own independent calculation

O4GUAMIS

1   under the sentencing guidelines, I did include not only the two

2   level reduction for acceptance of responsibility but also the

3   additional level -- additional one level reduction for timely

4   notice of an intent to plea.

5       I will note for the record that the stipulated

6   guidelines range is consistent with what's set forth in the

7   PSR, the calculation by the probation office, and that also

8   matches the independent calculation that I did.

9       So just to confirm, there are no disputes or

10  objections with respect to the PSR, correct?  Mr. Coyle?

11      MR. COYLE:  None from the government, your Honor.

12      THE COURT:  And is that true from the defense as well,

13  Mr. Eskew?

14      MR. ESKEW:  Yes, Judge.

15      THE COURT:  All right.  So I will adopt the PSR in its

16  entirety including the factual findings and the guidelines

17  calculations that are set forth therein.  The PSR will be made

18  part of the record in this matter.  It will be filed under

19  seal.  If any appeal is taken, counsel on any appeal may have

20  access to the PSR without application Court.

21      All right.  Before I turn to imposing sentence, does

22  the government wish to be heard?

23      MR. COYLE:  It does, your Honor.

24      THE COURT:  Please.

25      MR. COYLE:  Thank you.

O4GUAMIS

1        Your Honor, Mr. Aminov is the first defendant to be
2   sentenced in this 11-defendant fraud case.
3        THE COURT:  Am I correct that he's also the first to
4   have pled, right?
5        MR. COYLE:  That's correct, your Honor.
6        THE COURT:  Yes.
7        MR. COYLE:  And he sits at the very top of that
8   indictment for very good reason.  I'll talk in a bit about
9   Mr. Aminov's precise roll within the scheme and the 3553(a)
10  factors as they pertain to him and why the government
11  absolutely believes that the sentence of 120 months is
12  necessary under those factors.
13       But, first, I want to talk about the scheme itself,
14  because the government hasn't had a chance yet to do that in
15  court given Mr. Aminov is the first to be sentenced and because
16  this is not a typical financial fraud case.  The scheme was
17  uniquely insidious and harmful in a number of ways that are
18  very important to understand and I'd like to begin there.
19       Not long ago, the HIV/AIDS epidemic was ravaging the
20  country and New York City in particular.  At that time an HIV
21  diagnosis was akin can to a death sentence.  There was
22  extraordinary fear and a true public health emergency.
23  Pharmaceutical companies set off to develop drugs to treat this
24  deadly infection.  And a major breakthrough came, a medical
25  changer, antiretroviral medications that could effectively

O4GUAMIS

control the symptoms of HIV and help to prevent its spread.
And in a short period of time these drugs were improved upon
with multi-drug regimens that could both control HIV symptoms
and ameliorate the harmful side effects of these medications.
For many HIV patients, these drugs represented a new lease on
life.

         For the defendant and others involved in the scheme,
these drugs represented a massive opportunity to commit fraud.
Many of these drugs are under patent, there are no generics
available on the market, and they are very expensive.  But
because of the vital role that they play in treating this
disease, government insurance, like Medicaid and Medicare,
covers the cost of these prescriptions and reimburses upwards
of $3,000 for a single month prescription for a single patient
with HIV on the promise that that money will then be spent to
buy legitimate HIV medication from legitimate sources at or
near that price, they were reimbursed.

         And that's where the fraud comes in.  Instead of
spending the money collected from government insurance to buy
legitimate medication, pharmacies sourced the meds from black
market channels like Mr. Aminov instead.  At some point in the
black market HIV medication supply chain, that black market
medication comes from people buying HIV medication from
patients who had been prescribed that -- that medication and
giving them a nominal fee.  This medication could be expired,

O4GUAMIS

degraded, stored improperly, and in all events, is outside of the legitimate and regulated medication supply chain. Profit margins were enormous. While government insurance would reimburse for the full price to buy the meds from legitimate wholesalers, patients are paid only a few hundred dollars to buy back their medication. So that's thousands of dollars in profit off of a single monthly prescription for a single patient. Medicaid and Medicare were the primary economic victims of this fraud. And Mr. Aminov himself is liable for restitution to those entities of more than $13 million.

But make no mistake, your Honor. There were other victims here, vulnerable victims, the patients with HIV. They're victims of this fraud in at least two ways, first, many of these patients were on Medicaid and were poor. Many have drug dependencies and live in shelters. They were faced with the choice of selling back their meds for a few hundred dollars a month instead of taking the medication that they were prescribed to treat their potentially deadly infection. Every month these patients asking themselves, how do I feel, can I go a month without my meds? How are my T cell levels? How bad do I need that few hundred dollars that I'm being offered for my medication? Because these meds are so effective, a patient can go a month or two without the meds and maybe not end up in the hospital, but they certainly shouldn't do that. That puts their health at risk. It also makes the medication less

O4GUAMIS

1   effective when they —- those patients start retaking it.  It

2   also increases the likelihood of spreading the disease to

3   others.

4         To be clear, the government's evidence doesn't show

5   that Mr. Aminov bought back meds directly from patients but

6   that's because he was higher up in the scheme.  He received

7   large deliveries of medication from others that had been

8   collected from patients.  That's evident from the stockpile of

9   black market medication found in his townhouse that were

10  degraded, in the names of many different patients from many

11  different pharmacies and clearly bought back.  The government

12  isn't aware of any other way that one could acquire the

13  medication that Mr. Aminov was trafficking other than it being

14  bought back from patients at somewhere —- in somewhere in that

15  supply chain.

16        Now, the second way that HIV patients were victims of

17  the scheme is that pharmacy patients believed they were

18  receiving legitimately sourced medication, medication from

19  regular —- regulated wholesalers, but Mr. Aminov and others

20  took great care to remove the labels off of bought back

21  medications, dress up the bottles as though they were new,

22  placing new patient labels on them, and making them appear

23  legitimate, when, in fact, they weren't.  Patients were being

24  provided these dirty bottles doctored to look like legitimately

25  sourced medication.  These meds were sometimes expired as

O4GUAMIS

1    evidenced from messages on Mr. Aminov's phone and other

2    medication recovered in his townhouse.  This was extremely

3    reckless and could have -- and could have and very well might

4    have done really harm to the patients that actually took these

5    medications.

6          All this to say, your Honor, the offense here was

7    extremely serious.  This is not a garden variety economic fraud

8    but rather one designed to exploit vulnerable people with HIV.

9    And a significant sentence is needed for just punishment and to

10    reflect the seriousness of that offense.

11          Mr. Aminov was a leader in this scheme.  He occupied

12    many roles within it.  He operated his own pharmacy, called

13    Bless You RX that distributed black market meds and defrauded

14    Medicaid and Medicare in direct fraudulent billings in the

15    amount of millions of dollars, but he was also a major supplier

16    and distributor of the black market meds to other pharmacies

17    all around the New York.  Christy Corvalan's pharmacy in the

18    Bronx alone paid shell companies provided to her by Mr. Aminov

19    more than $5.7 million over two years, presumably as payment

20    for the black market meds that she was distributing to her

21    patients received from him.  He also sold to other pharmacy

22    owners including Roman Shamalov and Irina Polvanova, who are

23    also codefendants in this case, and he also provided vital

24    information to other coconspirators on how to execute the

25    scheme.  For example, he provided advice to Corvalan on where

O4GUAMIS

1    she could find pharmacists and new pharmacies that could be

2    purchased out of which he could perpetrate the fraud.

3           A sentence of 120 months is also required to provide

4    adequate deterrence in this case.

5           And I know, your Honor, the Court hears many arguments

6    about the role of deterrence in financial frauds, but I want to

7    be crystal clear about what deterrence means in this specific

8    case:  This scheme was extremely sophisticated.  Aminov

9    provided the names of 17 shell companies to Corvalan and others

10   where they made payment for the dirty meds that he provided

11   them.  Corvalan alone paid those companies $5.7 million in

12   handwritten checks.  Others picked up those handwritten checks

13   and cashed them at check cashing stores to launder those funds.

14   They walked out with bags of money, hundreds of thousands at a

15   time.  Where that money went is very difficult to determine.

16   The scheme was specifically designed to conceal all those

17   profits, but I'll note that more than $300,000 in cash was

18   seized from the townhouse from which Mr. Aminov perpetrated the

19   fraud.

20          Also, defendants engaged in the scheme constantly,

21   opened and closed different pharmacies to avoid the detection

22   of irregular billing patterns and audits from insurance

23   companies.  Aminov communicated with scheme participants using

24   encrypted messaging application like WhatsApp and telegram

25   including to receive their medication orders.

O4GUAMIS

1          In short, your Honor, frauds of this scale and

2     sophistication are extremely difficult to detect and to

3     prosecute.  That's the reality.

4          And that's evident from how this case was

5     investigated.  This case was investigated by the FBI's

6     healthcare fraud squad for nearly a year and a half before

7     charges were filed.  The investigation all began with a flyer a

8     single piece of paper saying, we buy meds, and a phone number

9     that was found at an HIV-assisted living facility.  An FBI

10    undercover agent called that number and the person on the other

11    end confirmed he would buy HIV and other meds from patients.

12    That person was an Antonio Payano, another codefendant.  Agents

13    then did an analysis that tied Payano to Christy Corvalan who

14    they saw was a pharmacy owner in the Bronx.  An in-depth

15    investigation was undertaken of the pharmacy's financials.

16    Medicaid and Medicare reimbursements and pharmacy billing

17    records that showed that almost all of those pharmacy patients

18    were HIV patients and were reimbursed almost $15 million for

19    HIV meds, yet almost no drugs were actually bought from

20    legitimate wholesalers.  Millions in checks, nonetheless, were

21    written to shell companies from the pharmacy account.  After

22    many months of intensive investigation, search warrants were

23    obtained that revealed Mr. Aminov as a major provider of the

24    black market meds to Corvalan and the others and that those

25    shell companies had been given to Corvalan by Aminov to make

O4GUAMIS

1    payment for his services.

2            In short, Mr. Aminov is a leader in a massive,

3    sophisticated fraud that took years of dedicated investigation

4    from skilled agents to thwart.

5            A sentence must send the message to these

6    contemplating leading a scheme like this on the front end no

7    matter how much money you might be able to make and no matter

8    what steps you try to take to avoid detection.  If you are

9    caught, as if -- as Mr. Aminov was caught here, the

10   consequences will be severe.  That is the importance of

11   deterrence in this case.

12           Finally, your Honor, I want to address the

13   characteristics of the defendant and acknowledge that there has

14   been tragedy in Mr. Aminov's life and he appears to take on

15   responsibilities for members of his family and others in the

16   community.  But the government just doesn't buy that in his

17   involvement was not primarily driven by greed.  That's the

18   nature of this scheme, making money off vulnerable patients.

19   And while the government can't show where, for example, the

20   5.7 million paid to the shell companies provided by Aminov to

21   Corvalan ultimately went, Aminov clearly profited.  He drove a

22   new Range Rover.  He had hundreds of thousands of dollars in

23   cash seized in his townhouse.  And we expect that he laundered

24   much greater sums for his personal benefit.  But the government

25   does recognize a degree of mitigation from the arguments raised

O4GUAMIS

1    in the defendant's submission.  And importantly, your Honor,

2    that mitigation has already been thoroughly considered and

3    accounted for.  Mr. Aminov's guidelines are 151 to 188 months

4    for his conduct.  Yet, he was offered a plea that allowed him

5    to plead to healthcare fraud conspiracy that has a statutory

6    maximum of 120 months --

7            THE COURT:  All right.  So, Mr. Coyle, a couple of

8    things.

9            MR. COYLE:  Yes.

10            THE COURT:  First, his guidelines sentence is

11    120 months.  It's not the range that would be yielded by the

12    matrix, correct?

13            MR. COYLE:  Absolutely, your Honor, that --

14            THE COURT:  All right.  And, second, your office

15    entered into the plea deal with Mr. Aminov, presumably for good

16    and sufficient reasons, you allowed him to plead only to the

17    one count.  Does not case law say it's not appropriate for you

18    to ask me to take into account that he's already gotten a

19    benefit by the deal that your office gave him?

20            MR. COYLE:  Your Honor, it is certainly appropriate to

21    look at what the conduct stipulated to --

22            THE COURT:  Yes.

23            MR. COYLE:  -- would have yielded.  Of course, the

24    guideline range operatively becomes the statutory max in the

25    event it is over that, but what the government is trying to

O4GUAMIS

1    explain and what it's very permissible for the Court to take

2    into account is the reasons why the government thought it

3    appropriate to make this deal here in saying that in doing so,

4    it already accounted for the mitigating factors that Mr. Aminov

5    raises now.  What I'm trying to communicate, your Honor, is

6    that the things raised in the defendant's submission are things

7    that the government considered and thought about --

8              THE COURT:  If you considered them, I'm the one that's

9    imposing sentence, not the government, and that's the question

10   I'm asking you.  So you considered it and that's all well and

11   good.

12             MR. COYLE:  And that's simply what I'm doing, your

13   Honor, is I'm communicating --

14             THE COURT:  But I'm not supposed to take it into

15   account.

16             MR. COYLE:  Your Honor, it is appropriate to consider

17   the things that Mr. Aminov had been charged with versus

18   something that he pled to --

19             THE COURT:  The conduct that he engaged in, yes.

20             MR. COYLE:  And, your Honor, the reason that it's put

21   in the plea agreement and within the guidelines calculation in

22   the PSR that informs the Court of but for that statutory

23   maximum sentence on the count that he pleaded to, what would

24   the conduct ultimately have yielded.  It is background

25   information.  That's why it is important for the Court to know,

O4GUAMIS

1    for example, the enhancements that did come into play here.

2            THE COURT:  Okay.  The second question I have for

3    you --

4            MR. COYLE:  Yes, your Honor.

5            THE COURT:  -- is in terms of avoiding unwarranted

6    sentencing disparities.  I understand Mr. Aminov was clearly a

7    leader here.  He stipulated to that in connection with his

8    plea.

9            MR. COYLE:  Yes, your Honor.

10           THE COURT:  But you haven't really addressed relative

11   culpability.  I mean, you said at the outset he's at the top.

12   Is that the government's view?

13           MR. COYLE:  Absolutely, your Honor.  There are 11

14   defendants charged in this case --

15           THE COURT:  And it's your view that he alone is the

16   most culpable?

17           MR. COYLE:  That is the government's view.  And, your

18   Honor, this is an important point, and I should have brought it

19   up earlier, that is further reason that -- not only, like

20   others involved in the scheme, did Mr. Aminov operate his own

21   pharmacy from which he was orchestrating this scheme, he was

22   also serving as an umbrella to other pharmacies to permit them

23   to do it, to source the black market meds to those other

24   pharmacies owned by Corvalan, Shamalov, and Polvanova in this

25   case.  So, yes, the government views Mr. Aminov as the most

O4GUAMIS

1    culpable in this scheme.

2            THE COURT:  Okay.  I don't know, I think I interrupted

3    you, and I'm sorry.  Finish your thoughts.

4            MR. COYLE:  No.  They were very helpful questions,

5    your Honor.  Thank you very much.

6            In all events, for all of these reasons that the

7    government stated including the government's thought process in

8    offering a plea to the healthcare fraud conspiracy, the

9    government believes that a 120-month sentence is sufficient but

10   not greater than necessary to achieve the aims of sentencing,

11   but it strongly believes that 120 months is necessary because

12   the sentence needs to reflect the gravity of this harmful fraud

13   that exploited vulnerable HIV patients, provide just

14   punishment, and provide deterrence to other leaders of large,

15   sophisticated schemes deliberately and skillfully designed to

16   evade law enforcement detection.

17           We respectfully request that the Court impose a

18   sentence of 120 months for all those reasons.

19           THE COURT:  All right.  Thank you.

20           MR. COYLE:  Thank you.

21           THE COURT:  Just one moment.

22           All right.  Mr. Coyle, I assume there are no victims

23   who wish to be heard?

24           MR. COYLE:  No, your Honor.

25           THE COURT:  All right.  Mr. Eskew, do you wish to

O4GUAMIS

1  address the Court?

2          MR. ESKEW:  Yes, please.  Thank you, your Honor.

3          Judge, I'll start just by noticing the obvious, which

4  is a full courtroom.  There's many members from the community

5  here to support Mr. Aminov and to show their love for him.

6  Those people include his mother, Rachel Aminov, who is seated

7  in the gallery.

8          THE COURT:  Where is -- Thank you.

9          MR. ESKEW:  It also includes, of course, friends,

10  family, members of his community.

11          THE COURT:  Are these all community members?

12          MR. ESKEW:  Just about, Judge.  There are some people

13  who are not from the community, the program that Mr. Aminov has

14  been participating in presentence is also here, The Focus

15  Forward Project, which I'm sure your Honor is aware of, and

16  they are here as well.

17          They can raise their hand.

18          THE COURT:  Thank you.

19          MR. ESKEW:  A couple of people from my office, Judge.

20          So it's mostly, though, I'd say 98 percent members of

21  his community showing their support, and people whose lives,

22  you know, Mr. Aminov has affected directly through some of his

23  charitable works and his support of his community and family.

24          Judge, there's three people who are not here, which

25  you know from our submission --

O4GUAMIS

1          THE COURT:  There's more than three people not here.

2          MR. ESKEW:  Sure.

3          THE COURT:  They're all of the people who were

4    impacted who were battling HIV.

5          MR. ESKEW:  You're right, Judge.  There's many

6    victims, and it's a very serious offense, and we will address

7    directly, Judge, the seriousness of the offense.

8          And I will say, Judge, right up front that Mr. Aminov

9    accepts responsibility.  You'll hear from him himself.  He's

10   aware of the seriousness of the offense and none of my comments

11   today, Judge, in mitigation of sentencing, which, of course,

12   you will hear from me, are meant to, in any way, minimize his

13   involvement.  I'll address that directly.  It's not meant to

14   minimize the impact on the HIV patients who took these

15   medications or the other codefendants in any way.  This was a

16   serious scheme.  And Mr. Coyle is right, that it's not your

17   garden variety economic offense.  It is a serious healthcare

18   fraud offense.  And we believe a serious sentence is warranted.

19         And Mr. Aminov sits in front of you today prepared for

20   that.  He knows it's coming.  He knows he has to face jail

21   time.  He knows he'll have a serious and significant separation

22   from many of the people in this room who love him very much.

23   So he knows that that's coming.  But, nonetheless, I hope that

24   your Honor will hear our argument in mitigation to say that we

25   don't think it needs to be 120 months, that it should be

O4GUAMIS

1    substantial, but something less than that, something

2    significantly less than that.

3           The three people that I was referring to, Judge, that

4    are directly involved in Mr. Aminov's life are his father and

5    his two brothers who are not here.  And I don't say that to be

6    dramatic.  I don't say that to invoke the Court's sympathy.  I

7    say that, Judge, because those three people loom large in this

8    case from the perspective of the history and characteristics of

9    the defendant and the nature and circumstances of the offense,

10   two very important considerations under 3553 -- 3553(a).

11          And I won't belabor the point, Judge.  I know you've

12   read the papers and all the letters and I know you're very

13   familiar with the PSR.  However, I do want to say that

14   Mr. Aminov's adult life has been marred by pretty significant

15   tragedy that is unique and unlike what I expect you'll face

16   with many of the defendants in this case and many of the

17   defendants generally who come before you.  That's not to say

18   that other defendants don't have their own unique and difficult

19   histories to face.  But Mr. Aminov was placed in a position

20   within his family where he and his mother were the only ones

21   left within his immediate family because of the tragic death of

22   his father to a hit-and-run accident when he was returning home

23   from services on Yom Kippur, his completely -- nearly

24   completely disabled brother who suffers from advanced multiple

25   sclerosis and who is now confined to an assisted living

1  facility and is on a feeding tube, and his other brother, who

2  committed suicide in 2019 as a result of issues with his own

3  mental health and left behind a wife and two children,

4  Mr. Aminov's niece and nephew.  And it's not just tragedy and

5  so be sympathetic to Mr. Aminov's situation, these are the --

6  the events that led directly to Mr. Aminov's involvement in the

7  charged conduct.  It's one of the reasons why Mr. Aminov's plea

8  was to a more narrow period of time than some of the other

9  defendants because he did not get involved from the beginning.

10 And so to address one of the points that the government makes

11 about, you know, characterizing in their sentencing submission

12 Mr. Aminov as the, quote-unquote, mastermind behind this

13 scheme, that doesn't square with the facts.  We don't deny that

14 he operated at a high level.

15          THE COURT:  You stipulated that he was the leader --

16          MR. ESKEW:  Yes --

17          THE COURT:  -- and organizer.

18          MR. ESKEW:  Absolutely, Judge.  But not the mastermind

19 of the scheme, as they paint him.

20          THE COURT:  All right.  But we're not going -- the

21 game of semantics doesn't really influence me.

22          MR. ESKEW:  Judge, it's not meant to be semantical.

23 It's meant to be a reflection of the facts.

24          THE COURT:  I didn't mean you.  I meant the

25 government's use of the term mastermind is not determinative.

O4GUAMIS

```
 1   I'm just telling you.

 2            MR. ESKEW:  Understood.  He was an organizer, a

 3   leader., he's accepted responsibility for that.  It's

 4   comprised -- it is captured by his sentencing guidelines.

 5            But he came to this scheme largely after the death of

 6   his brother and took over that business and made a critical

 7   mistake in doing so, which is that he continued that business

 8   in the shoes of his brother in a manner that continued the

 9   illegal conduct that had been ongoing, that distributorship,

10   and that's a mistake that Mr. Aminov is reckoning with now and

11   will reckon with as he sits in jail after your Honor's

12   sentence.

13            THE COURT:  And that's 13 years after his father was

14   killed, right?

15            MR. ESKEW:  Yes, correct, Judge, it was, but

16   contemporaneous with the death of his brother.  And we do think

17   it's significant, Judge, that with respect to the nature and

18   circumstances of the offense, the context of that crime was not

19   an outgrowth of pure greed.  Certainly they made money and

20   certainly Mr. Aminov benefited from that, as can be seen, but

21   there are some defendants in this case, Judge, where they

22   benefited to a far greater degree comparatively.  And, so, yes,

23   he's an organizer, leader --

24            THE COURT:  And he stipulated to a loss amount of over

25   $13 million.
```

1          MR. ESKEW:  Yes, Judge.

2          THE COURT:  He stipulated to that.

3          MR. ESKEW:  Yes.

4          THE COURT:  Okay.

5          MR. ESKEW:  And he stipulated to it, Judge, because

6     that is the loss number that is reflective of his -- of his

7     involvement in the scheme during the period of time -- the

8     period of time in which he was involved and he accepted the

9     forfeiture number based on the money flow that was calculated

10    by the government to him.

11          I think, Judge, that when considering the history and

12    characteristics of the defendant and the nature and

13    circumstances of the offense, there is mitigation present.

14    Because of his tragic circumstances, because of the

15    circumstances under which he came to the offense, and the

16    manner in which he participated in it.  And some of the other

17    factors that you can see in the letters that I won't -- that I

18    won't belabor but his very, very significant involvement in the

19    community, with veterans, with poor folk, all of which predate

20    his involvement in this offense and are a reflection of his

21    true character, not necessarily just a defendant who is trying

22    to prove to your Honor that he's made a turn for the better.

23          Judge, with respect to deterrence, obviously, there's

24    a need for general and specific deterrence.  It will be part of

25    the considerations that your Honor makes in fashioning your

O4GUAMIS

1    sentence.  But I would submit, Judge, that the government's the

2    outlier here when it comes to the recommended sentence.  I

3    mean, probation obviously is not entitled to, you know, any of

4    your deference, your Honor, you hand out the sentence, of

5    course, you have the authority to do that.  But we do think

6    it's significant that probation took a look at this and met

7    with the defendant and went through his mitigation and took a

8    look at the offense as well and came up with a sentencing

9    recommendation of 84 months.  We do think that that's a

10   reflection of the fact that there is substantial mitigation

11   here when you bring into account all of the 3553(a) factors,

12   not just the offense conduct, which looms large and requires a

13   substantial sentence, but is not the only consideration.

14          And so, Judge, we would submit that when you consider

15   all of those factors, Judge, his tragic circumstances and his

16   family situation, he knows that he will be separated from his

17   family now for a significant period of time, but as he sits

18   here, what he reflects upon is that if that sentence is

19   120 months, there's a decent chance that he never sees his

20   disabled brother again and possibly even his mother, who is

21   elderly.  And so we ask for that sentence to be sufficient,

22   serious, to provide general deterrence, to send a message to

23   the other defendants in this case.

24          I'll note that Mr. Aminov pled first, as your Honor

25   knows, and after his plea, a couple -- I think one other

O4GUAMIS

1    defendant and/or maybe two are contemplating pleas or have pled

2    guilty.  So he deserves at least a little bit of credit there

3    for acceptance of responsibility which he gets under the point

4    system.

5              But, Judge, I would submit that he is suffering --

6              THE COURT:  He gets that in the calculation of his

7    guidelines range.

8              MR. ESKEW:  He does, Judge, he does.

9              He sits here knowing that he faces a substantial

10   sentence, and what we ask, Judge, is to apply some mitigation

11   credit for -- for some of these mitigating factors that

12   probation certainly has observed and made a recommendation

13   about.

14             And I'll just make one very last brief point, Judge,

15   with respect to the back and forth that you had with the

16   government, I don't really think it's necessary because your

17   Honor raised it already, but I will say that it is not

18   appropriate to consider the plea negotiations of the parties.

19   The government, you know, made a decision to cap it at

20   ten years and we made a decision to not fight on certain other

21   aspects that we could have fought on, not knowing how they

22   would turn out.  That's litigation risk.  That's the

23   consideration of the parties.  And your Honor knows that the

24   Second Circuit has said that it is -- if you are going to

25   provide mitigation, you do so from 120 months, not from

O4GUAMIS

1  whatever would have exceeded the statutory cap.  That would be

2  reversible error, and it's incorrect for the Court -- for the

3  government to ask for it.

4          THE COURT:  I acknowledge that.  That was my point.

5          MR. ESKEW:  Thank you, Judge.

6          I have nothing further, but, you know, Mr. Aminov has

7  prepared a statement he would like to, of course, address the

8  Court.

9          THE COURT:  Of course.  Sure.

10          So, Mr. Aminov, whenever -- whenever you're ready, and

11  however you're most comfortable.  If you prefer to remain

12  seated, you may.  Certainly you should take a drink of water.

13  If you prefer to stand, you may do that, however you're more

14  comfortable.

15          MR. ESKEW:  Judge, he's prepared a written statement.

16          THE COURT:  Sure.  Obviously, I'm happy to hear from

17  Mr. Aminov.  You're not obligated, sir, to speak, but if you

18  wish to, I'm happy to hear from you.

19          THE DEFENDANT:  Your Honor, I stand before you today

20  deeply remorseful for the actions that have brought me here.

21          THE COURT:  Why don't you fix the microphone, Counsel,

22  just point it out.

23          THE DEFENDANT:  I recognize the gravity of my crimes

24  and the severe impact they have had on vulnerable individuals,

25  our healthcare system, and the trust of our community.

O4GUAMIS

1        I'm profoundly sorry for exploiting those in dire need

2   of medical care and for undermining the integrity of our

3   healthcare institutions.  My actions were wrong and they hurt

4   people who were already struggling with their health and

5   financial stability.  This reality weighs heavily on my heart

6   and I'm committed to making amends.

7        I understand that my behavior has damaged lives, and

8   for that, I am truly sorry.  I'm prepared to face the

9   consequences of my actions and to use this experience as a

10  turning point.  I hope for an opportunity to demonstrate my

11  commitment to living a responsible and contributive life moving

12  forward.

13       I ask for your mercy in sentencing, not just for me

14  but for the sake of my family who depends on me.  I have been

15  fortunate in my life to have people around me who care about me

16  and love me.  Some of them are here today, my family, my

17  mother, my friends, my community.  I let -- I let them down as

18  well.

19       But I have also experienced terrible tragedies in my

20  life and my family needs me to help care for them and provide

21  for them.  This is especially true of my disabled brother, my

22  wife, my mother, and my deceased brother's family.  I know I

23  must go to jail and be separated from them but I ask for your

24  mercy and consideration in handing out that sentence that I can

25  be reunited with them in the near future to live a better life

O4GUAMIS

| | |
|---|---|
| 1 | and care for them.  I pledge to do everything within my power |
| 2 | to rectify the harm I have caused and to contribute positively |
| 3 | to society if given the chance. |
| 4 | Thank you. |
| 5 | THE COURT:  All right.  Thank you, Mr. Aminov. |
| 6 | So at this time, I'm going to talk to you about my |
| 7 | thought process in terms of crafting the appropriate sentence |
| 8 | for this case and the sentence that I do intend to impose. |
| 9 | So I begin, as I'm obligated to do, with my own |
| 10 | independent calculation under the sentencing guidelines.  I'm |
| 11 | going to run through it quickly because I told you at the |
| 12 | outset that my own calculation is consistent with what you all |
| 13 | stipulated to in the plea agreement and what's contained in the |
| 14 | PSR.  So I don't want to belabor that, but as I say, I'm going |
| 15 | to describe the sentence I do intend to impose and my statement |
| 16 | of reasons.  After I do that, both sides will have the |
| 17 | opportunity to make any legal objections before sentence is |
| 18 | finally imposed. |
| 19 | So, in doing my own guidelines calculation, I used the |
| 20 | November 1, 2023 guidelines manual.  Under that manual, the |
| 21 | guideline for violation in Count One is Section 2B1.1, which is |
| 22 | the guideline for the underlying offense of healthcare fraud. |
| 23 | Because Count One has a statutory maximum term of imprisonment |
| 24 | of ten years, the base offense level is 6.  There are a number |
| 25 | of adjustments that I made based on various offense |

O4GUAMIS

characteristics including because the total loss amount of
$13,270,379.50 exceeds nine and a half million but does not
exceed 25 million, the offense level is increased by 20.  There
is a further offense characteristic adjustment because
Mr. Aminov was convicted of a federal healthcare offense
involving a government healthcare program and the loss to that
government program was more than $7 million.  Therefore, the
offense level is increased by 3.  Because the offense involved
sophisticated means and Mr. Aminov intentionally engaged in or
caused the conduct constituting sophisticated means,
specifically through the use of shell companies, the offense
level is increased by 2.

There are then adjustments for victim related
considerations because Mr. Aminov knew or should have known
that among the victims of his offense were vulnerable victims
and the offense enlarged a large number of vulnerable victims,
the offense level is increased by 4 additional points.  And,
finally, because Mr. Aminov was, by his own stipulation, an
organizer, leader, manager, or supervisor in criminal activity,
other than that described in Section 3B1.1(a) and (b), there is
an additional two-level increase in the offense level resulting
in an adjusted offense level of 37.

I then did subtract the two levels that we talked
about earlier for Mr. Aminov's acceptance of responsibility and
an additional one-level reduction for his timely notice of

O4GUAMIS

1    intent to enter a plea resulting in a total offense level of

2    34.

3        Mr. Aminov has no criminal history points putting him

4    had in Criminal History Category I.  The guidelines range for

5    an offense level of 34 and a Criminal History Category of I is

6    151 to 188 months.  However, pursuant to Section 5G1.1(a) and

7    (c), because the statutory maximum sentence for Count One is

8    120 months of imprisonment, the guidelines range applicable to

9    this case is 120 months of imprisonment.

10        Now, in addition to considering the sentencing

11    guidelines themselves and the calculation of the guideline

12    sentence of 120 months, I've also very carefully considered and

13    weighed all of the factors that Congress has set forth in the

14    statute at 18, United States Code, Section 3553(a).  For the

15    benefit of everyone here, those factors include the nature and

16    circumstances of the offense and the history and

17    characteristics of the defendant, Mr. Aminov, the need for the

18    sentence imposed to further the goals of sentencing which

19    include the need to reflect the seriousness of the offense, to

20    promote respect for the law, and to provide just punishment for

21    the offense, to afford adequate deterrence to criminal conduct,

22    to protect the public from further crimes of the defendant, to

23    provide the defendant with needed educational and vocational

24    training, medical care, or other correctional treatment in the

25    most effective manner.  The 3553(a) factors also include the

O4GUAMIS

sentencing guidelines and the applicable range for this case as
well as any other applicable policy statements issued by the
commission and the need to avoid unwarranted sentencing
disparities among similarly-situated defendants and the need to
provide restitution to the victims.

So, Mr. Aminov, in evaluating what would be an
appropriate sentence in your case, I have carefully weighed all
of these 3553(a) factors that I've just outlined and the
appropriate purposes of sentencing as reflected in the statute.

I'll note at the outset that this is an extremely
serious case, and I'll highlight the factors that I find most
relevant in this case. As I say, I begin with the seriousness
of the offense, which is extreme. For years you led, you
orchestrated, you participated in a massive sophisticated fraud
that generated tens of millions of dollars in profits by
exploiting vulnerable patients suffering from HIV. This is
significantly different than a pure economic fraud case or even
any other healthcare fraud case that I have seen, frankly. As
one of the ring leaders of this massive scheme, you oversaw and
coordinated the procurement and trafficking of potentially
life-threatening black market HIV medication to vulnerable and
oftentimes low-income victims. You knew that the quality and
condition of those black market medications were potentially
dangerous. And yet you and your coconspirators took active
steps to make the bottles of diverted medication falsely appear

O4GUAMIS

1     that they were new and in proper condition.

2              Now, at the plea hearing, you tried to distance

3     yourself from the sale of those black market drugs to patients

4     by the pharmacies, but you stipulated in your plea agreement

5     that you "caused patients with HIV to receive illegally sourced

6     black market HIV medication."  And while you may not have

7     masterminded the so-called buyback incentive portion of this

8     healthcare fraud scheme, the large quantities of bottles of

9     drugs with names of patients on them and other paraphernalia

10    that were found in your apartment when it was searched make it

11    very clear that you did participate in and profit from that

12    heinous aspect of the fraud.

13              I'll note too that it is troubling that there was an

14    assault type firearm found in your home as well.

15              Not only did your actions defraud government insurance

16    programs including Medicaid and Medicare of at least

17    $13 million by your own stipulation, but, more importantly,

18    your actions exploited low-income HIV patients and put their

19    health and safety at severe risk.  You profited from the

20    year-long scheme which incentivized vulnerable patients, who,

21    as I said, were often impoverished to sell back their

22    life-saving medication in exchange for small but much needed

23    amounts of money.

24              A review of your personal history, which I will talk

25    about in more detail in a moment, demonstrates to me that your

O4GUAMIS

conduct was not driven by financial desperation or poverty, but instead can only be attributed to greed.

Now, in addition to this trafficking scheme which you did spearhead, that scheme was highly sophisticated and intentionally structured to avoid detection. You utilized at least 17 different shell companies to hide the scheme and to conceal the proceeds of your fraud. You and your coconspirators regularly closed and opened pharmacies so that irregular billing patterns could not be detected.

In sum, the seriousness of the offense and the calculating nature of it weighs in favor of a substantial term of imprisonment.

Now, I turn, as I said I would, to your history and personal characteristics, and, as I always do when I'm considering sentencing, I did my best to make an assessment of you as an individual. You had, in your own words, a happy childhood, during which time you enjoyed a close relationship with both your parents and siblings. Your parents were able to provide you and your siblings with a comfortable middle class upbringing and they met all of your basic needs. You were never subjected to abuse or neglect. That all stands in stark contrast to many of the defendants who come before me.

Now, I do understand that you and your family faced hostility and anti-Semitism in your home country, something no person should ever experience anywhere. But your parents

O4GUAMIS

sought a better way of life for you and your siblings and they
were able to get that for you, enabling you to move to this
country when you were young, and ultimately you become a
naturalized citizen.

Now, I understand that you faced great struggles as a
result of the death of your father and more recently your
brother.  You do remain close, as I understand it, with your
mother and your devoted wife and your brother.  I'm truly sorry
for the traumatic events in your life, but they do not justify
the behavior you engaged in or the fraud that you perpetrated.

Now I have carefully read the many letters of support
that I received, 25 of them, I believe in all.  They depict a
kind man, a caring man.  It's very clear to me that your family
and friends love you.  The turnout of people in this courtroom
is probably among the highest I've ever had in any of my cases.
So, obviously, you are loved, you are supported, and you have a
community that cares about and respects you.  You have a strong
community standing behind you and it will be imperative that
you lean on the support going forward.  But I have to note that
such strong ties to your family, your friends and your faith
render your conduct all the more hard to understand and all the
more troubling.

You are clearly well educated and intelligent.  You
have a bachelors degree and a masters degree in science from a
well-regarded New York university.  You also have an extensive

O4GUAMIS

1  employment background.  You've held various well-paying jobs.

2  You could have used these gifts in a positive way to help your

3  family.

4          Instead, you chose greed.  In essence, as I've already

5  noted, your conduct doesn't appear to have been driven by a

6  failed support system, by dire poverty or a lack of education.

7          Despite all of the opportunities that life provided to

8  you and your strong network of support, you chose to use your

9  education and intelligence to engage in serious criminal

10  conduct and the scale of the fraud that you perpetrated is

11  enormous resulting in a loss to the government of more than

12  $13 million and untold potential harm to patients struggling

13  with HIV.

14          I must consider, and I have considered, the need for

15  both specific and general deterrence.

16          Now, I acknowledge that you have no criminal history

17  and no prior interaction with the criminal justice system.  I

18  note too that you were the first of the named defendants in

19  this case to accept responsibility and to plead guilty.  I

20  credit too your charitable endeavors and your commendable

21  efforts to care for your family including your nieces and your

22  nephews.  I note too your efforts to carry on the

23  not-for-profit that, as I understand it, was begun by your

24  brother.

25          But having said all that and those are all mitigating

O4GUAMIS

considerations, there is still a serious need for general

deterrence in these circumstances.  Congress and our federal

courts have explicitly recognized that this sort of collective

criminal activity in which you engaged, a conspiracy, poses a

greater threat to the public safety and welfare than individual

conduct, and, therefore, a substantial sentence is needed to

demonstrate that when these types of sophisticated criminal

conspiracies are detected and disrupted, the consequences will

be severe.  The sentence must also send a message that black

market drugs pose a great threat to the citizens of our country

and whose who partake in their purchase and resale will be held

accountable.

        I also consider the need to protect the public.  As

I've mentioned repeatedly, you were responsible for

distributing large quantities of potentially dangerous black

market drugs to vulnerable HIV patients, and as such, the need

to protect the public and promote respect for the law does

favor a long term of imprisonment.

        I consider also the need to provide you with needed

medical care or other correctional treatment in the most

effective manner.  We've talked about your ongoing struggles

with mental health issues and substance abuse, and apparently

those have worsened since the onset of this case.  These

circumstances counsel me that during a period of supervised

release you obtain appropriate medical care and mental health

treatment, both during a period of supervised release and to

the extent it's obtainable during any period of incarceration.

Now your counsel urges that I give significant weight

to your commitment to your family and your ongoing care and the

impact that a term of imprisonment will have on your family.

But, as you acknowledge in your own submission, those are all

consequences that you brought on yourself, and, frankly, every

defendant who stands before me has people who care about him or

her who are impacted by the consequences of their wrongful

conduct.  So while I take it into account, it does not

ameliorate the other considerations.

Now, I want to say finally that I am mindful of the

need to avoid unwarranted sentencing disparities.  So I do

weigh heavily your role as a leader and an organizer, which

make you particularly culpable here.  You stipulated, as I

said, to causing over $13 million in loss to a government

healthcare program and to orchestrating a scheme to traffic

drugs to innocent victims, black market drugs.  And against

that though, I give weight, as I said earlier, to the fact that

you were one of the first to accept responsibility and enter a

plea.

I have also taken into account the statistics from the

sentencing commission that are contained in the PSR with regard

to the average sentence and a median sentence for defendants

whose primary sentencing guideline is the same as yours,

O4GUAMIS

1    Section 2B1.1, and who have the same offense level of 34 and a

2    criminal history category of I.

3           All of these considerations lead me to an intent to

4    sentence you to a sentence of 108 months of imprisonment to be

5    followed by a three-year term of supervised release, during

6    which the standard mandatory and special conditions of

7    supervised release that we have discussed would be imposed.  I

8    find that such a sentence is sufficient but not greater than

9    necessary to serve the goals of sentencing as set forth in

10   Section 3553(a).

11          In addition, there is a $100 per count mandatory

12   special assessment that is payable immediately.  Based on the

13   financial information that you've provided, I do find that you

14   don't have the ability to pay a fine.  Section 5E1.2 dictates

15   that the Court shall impose a fine except where it is

16   established that you are unable to pay.  And as I say, based on

17   the financial information provided and what's in the PSR, I

18   find that you do not have an ability to pay and I don't intend

19   to impose a fine.

20          I will impose restitution in the amount of

21   $13,270,379.50.  I will enter the consent order of restitution

22   that the parties will be resubmitting to me later on today.

23          I would ask you, when you revise it, please, also, in

24   paragraph 2 on page 2, the third full paragraph where you say,

25   any unpaid amount remaining upon release from prison will be

O4GUAMIS

1    paid in installments, it should say on what period, monthly,

2    are you talking?  Monthly installments?  Of at least 15 percent

3    of the gross income payable on the 1st?  The 15th?  What day

4    of each month?  All right.  Include that revision.  I will

5    enter that order of restitution.

6              The preliminary order of forfeiture that I signed on

7    December 11, 2023, that is on the docket at ECF No. 156 will be

8    incorporated into the judgment in this case, and that does call

9    for forfeiture in the amount of $4,401,495 and the forfeiture

10   of specific property, namely the cash that was found in the

11   amount of $318,393.

12             So let me pause and ask each side --

13             And, Mr. Eskew, if you wish time to confer, you may do

14   that --

15             But I will ask either side, starting with the

16   government, is there any legal reason sentence may not be

17   imposed as I've outlined?

18             MR. COYLE:  No, your Honor.

19             THE COURT:  All right.  Mr. Eskew?

20             MR. ESKEW:  No, your Honor.

21             THE COURT:  All right.  Mr. Aminov, would you please

22   stand.

23             Sir, it is the judgment of the Court that you be

24   remanded to the custody of the Bureau of Prisons to serve a

25   term of incarceration of 108 months.

O4GUAMIS

|  1 |       I do find that Mr. Aminov is an appropriate candidate

|  2 | for voluntary surrender and I will order that you surrender to

|  3 | the facility designated by the Bureau of Prisons on

|  4 | August 9th of this year.

|  5 |       Once you're released from prison, you'll serve a term

|  6 | of supervised release for a period of three years, during which

|  7 | the standard mandatory and special conditions of supervised

|  8 | release set forth in the PSR and that we have discussed will be

|  9 | imposed.

| 10 |       There is a $100 mandatory special assessment payable

| 11 | immediately.

| 12 |       You must pay restitution in the amount outlined and

| 13 | the preliminary order of forfeiture that I have previously

| 14 | entered will become final and is -- will be incorporated in the

| 15 | judgment that will be entered on the docket.

| 16 |       You may be seated, sir.

| 17 |       All right.  Mr. Eskew, you mentioned before a request

| 18 | that Mr. Aminov be evaluated for eligibility for RDAP?

| 19 |       MR. COYLE:  Yes, Judge.  And I'd also ask for the

| 20 | Court's recommendation to FCI Otisville based on their ability

| 21 | to particularly care for Jewish prisoners, and they have a

| 22 | program there, and --

| 23 |       THE COURT:  They have a specialized program?

| 24 |       MR. ESKEW:  I believe that Otisville has facilities

| 25 | for orthodox and observant Jewish individuals.  And we would

O4GUAMIS

1    ask that the Court recommend that.

2             THE COURT:  Okay.  Look, I will tell you that I am

3    instructed by Bureau of Prisons, or I'm reminded or

4    reprimanded, that is not up to me what facility a defendant

5    goes to.  That's entirely -- from today on, it's entirely

6    within the province of the Bureau of Prisons.  I will make a

7    strong recommendation.  They asked me to just recommend

8    geographic areas.  So I assume Mr. Aminov lives in New York,

9    right?

10             MR. ESKEW:  Yes, Judge.

11             THE COURT:  I assume you want as close as possible to

12   New York City with a strong recommendation for a facility that

13   has programs that can accommodate --

14             Is Mr. Aminov orthodox Jewish?

15             MR. ESKEW:  He is observant.  He is observant.

16             THE COURT:  Okay.  And also that he be evaluated for

17   the RDAP program.  I don't know if Otisville has that.  So the

18   Bureau of Prisons needs to weigh all of these considerations.

19             MR. ESKEW:  Thank you, Judge.  That's all we're

20   asking.

21             THE COURT:  All right.  I will include that in the

22   judgment.

23             Are there any other requests from the defense?

24             MR. ESKEW:  No, Judge.  Thank you.

25             THE COURT:  All right.  Mr. Aminov, to the extent you

O4GUAMIS

1    haven't waived it in the plea agreement that you entered into,

2    I need to advise you that you do have the right to appeal from

3    your conviction and from your sentence.  If you're unable to

4    could pay the costs of an appeal, you may apply for leave to

5    appeal in forma pauperis.

6            Any notice of appeal needs to be filed within 14 days

7    of the entry of the judgment of conviction.  I try very hard to

8    get that entered promptly.  Given the hour, it may not go in

9    before the end of the day today, but it will be entered

10   tomorrow in all likelihood and that would sort start the clock

11   running on the time for any appeal, should you wish to take

12   one.

13           Do you understand, sir?

14           THE DEFENDANT:  Yes.

15           THE COURT:  All right.  Is there anything from the

16   government by way of a motion?

17           MR. COYLE:  Yes, your Honor.  The government moves to

18   dismiss all open counts on the S1 superseding indictment

19   against Mr. Aminov.

20           THE COURT:  All right.  Was he named in the original?

21           MR. COYLE:  He was, your Honor.  The original

22   indictment and the S1 superseding indictment, he was both named

23   in.  The government hereby moves to dismiss all open counts

24   against him in those two charging instruments.

25           THE COURT:  All right.  All open counts against

O4GUAMIS

1    Mr. Aminov other than the one on which he has been convicted

2    and sentenced will be dismissed.

3         So, Mr. Aminov, before we adjourn, I just want to say

4    to you, sir, obviously, you have an enormous community of

5    people who care about you.  Hopefully, you'll be designated to

6    a facility close enough for them all to remain in touch with

7    you.  Rely on these people.  You're going to need their help

8    and support, but I'd also encourage you in the strongest terms

9    I can to take advantage of the counseling, both for your

10   addiction problems and your mental health problems, and spend

11   some time thinking seriously.

12        You told me that you see this as a turning point.  You

13   told me that you're committed to live a law-abiding life.

14   Think about how you are going to turn your life back on the

15   proper path and how you are going to contribute to society

16   after you serve your term of imprisonment.

17        I wish you all the best, sir.

18        THE DEFENDANT:  Thank you.

19        THE COURT:  Is there anything from you, Mr. Eskew?

20        MR. ESKEW:  No, Judge.

21        THE COURT:  All right.  Nothing else from the

22   government?

23        MR. COYLE:  No, thank you, your Honor.

24        THE COURT:  Please stay seated.

25        I thank the court reporter very much and I thank the

O4GUAMIS

1    marshal too for coming up.

2         We'll stand adjourned.  Thank you.

3         I thank our interpreter too.  Thank you.

4                        o0o